**In the Matter of the PHILADELPHIA STOCK EXCHANGE, INC.**

Nos. 613, 2007, 615, 2007.

Supreme Court of Delaware.

Submitted: March 12, 2008.
Decided: March 27, 2008.

Robert J. Valihura, Jr., Esquire (argued), The Law Office of Robert J. Valihura, Jr., Wilmington, Delaware; for Objectors Below–Appellants Richard P. Kahn, Tim Lobach, Eugene Saftlas, DLD Investments LLC, William Marko, Ralph Gritt, PennMont Securities, Mitchell Marcus and Aubrey & Company; Of Counsel: Steven B. Mirow, Esquire, of Philadelphia, Pennsylvania; for All Objectors Below–Appellants Other Than PennMont Securities; Lynanne B. Wescott, Esquire, of Philadelphia, Pennsylvania; for Objector Below–Appellant PennMont. Securities.

Michael J. Maimone (argued), Paul D. Brown and Joseph B. Cicero, Esquires, of Edwards Angell Palmer & Dodge LLP, Wilmington, Delaware; for Appellants William Schultz, Mitchell Berkowitz, Terrence Gallagher, Mark Thomas, Tom Flynn, Alex Benedik, Don Riley, Glenn Smith, Jeff Mattero, Jim Crompton, Al Perry, Steve Katlin, James W. Ryan, Shoreline Trading, Michael Burtnick, Chris Showers, Ron Henry, Keith Ford, Tom Mester, Fred Martin, Dick Mesirov and Hovde Capital Advisors LLC.

Joseph A. Rosenthal and Jessica Zeldin, Esquires, of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Of Counsel: Lawrence Deutsch (argued), Robin Blumenfeld Switzenbaum, Barbara A. Podell and Joshua C. Schumacher, Esquires, of Berger & Montague, P.C., Philadelphia, Pennsylvania; for Plaintiff Below–Appellee Chuck Ginsburg.

Peter J. Walsh, Jr. and Abigail M. LeGrow, Esquires, of Potter Anderson & Corroon LLP, Wilmington, Delaware; Of Counsel: Eric S. Goldstein, Esquire, of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; for Defendant Below–Appellee Citigroup Financial Products, Inc.

Paul J. Lockwood, Esquire (argued), of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Of Counsel: Jay B. Kasner, Esquire, of Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York; for Defendant Below–Appellee Merrill Lynch, Pierce, Fenner & Smith Incorporated.

Edward M. McNally, Esquire, of Morris James LLP, Wilmington, Delaware; Of Counsel: Stephen J. Senderowitz, Esquire, of Winston & Strawn LLP, Chicago, Illinois; for Defendant Below–Appellee Citadel Derivatives Group LLC.

Allen M. Terrell, Jr., and Catherine G. Dearlove, Esquires, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of

Counsel: Francis E. Bivens and John B. Gaffney, Esquires, of David, Polk & Wardwell, New York, New York; for Defendant Below–Appellee Morgan Stanley & Co. Incorporated.

David C. McBride and Christian Douglas Wright, Esquires, of Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware; Of Counsel: Herbert S. Washer and Adam S. Hakki, Esquires, of Shearman & Sterling LLP, New York, New York; for Defendant Below–Appellee Credit Suisse First Boston Next Fund, Inc.

Joel E. Friedlander, Esquire, of Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; Of Counsel: Scott A. Edelman, Stacey J. Rappaport and Robert C. Hora, Esquires, of Milbank, Tweed, Hadley, McCloy LLP, New York, New York; for Defendant Below–Appellee UBS Securities LLC.

William M. Lafferty (argued), David J. Teklits, Samuel T. Hirzel and Jeremy D. Eicher, Esquires, of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Of Counsel: Stephen J. Kastenberg and Paul Lantieri III, Esquires, of Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania; Tariq Mundiya, Esquire, of Willkie Farr & Gallagher LLP, New York, New York; for Defendant Below–Appellee Philadelphia Stock Exchange, Inc., and the Individual Defendants Below–Appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice.

Pending before us are appeals from an Order and Final Judgment of the Court of Chancery approving a settlement of this shareholder class action, over the objection of certain members of the class. The action challenged certain transactions (the "Strategic Investor Transactions") in which almost 90% of the equity of the Philadelphia Stock Exchange ("PHLX" or "the Exchange") was sold to six institutional investors (the "Strategic Investors").[1] The settlement, which occurred on the eve of trial following a mediation before a different judge, includes: (1) the return, to the plaintiff class, of 55,257 PHLX shares, representing about 14% of the shares the Strategic Investors acquired in the Strategic Investor Transactions; (2) the payment by PHLX of $17.1 million into a settlement fund; and (3) certain guaranteed protections against any future dilution of the plaintiff class.[2]

The Court of Chancery approved the settlement as fair and reasonable and certified the settlement class. That Court also rejected the objectors' multitudinous procedural and substantive challenges, including their claim that the proposed settlement was flawed because it did not establish how the settlement proceeds would be allocated among the class members. The Chancellor decided that the settlement approval process would be bifurcated. That is, the Court would determine the fairness of the settlement as a whole before, and separately from, considering any plan of allocation—a plan that the parties would develop and present after

---

1. The Strategic Investors are Citadel Derivatives Group, LLC; Merrill Lynch, Pierce, Fenner & Smith, Inc.; Credit Suisse First Boston Next Fund, Inc.; Citigroup Financial Products, Inc.; Citigroup Global Markets, Inc. and Citigroup Derivative Markets, Inc; Morgan Stanley & Co., Incorporated; and UBS Securities, LLC.

2. Additionally, Meyer D. Frucher, the Chairman of the Exchange's Board of Governors, agreed to the cancellation of his interest in 14% of the Restricted Stock Units awarded to him under PHLX's management compensation plan.

the order approving the settlement became final.

On November 7, 2007, the PHLX announced that it had entered into an agreement to be acquired by The Nasdaq Stock Market, Inc. ("Nasdaq") for $652 million. That amount translates to a dollar value for the settlement of nearly $99 million. The PHLX–Nasdaq agreement requires that the transaction close by no later than July 31, 2008. A critical condition to closing is that the approval of the settlement be final and not subject to further appeal by that deadline.

Two appeals from the final order were filed.[3] Given the above-described time constraints, this Court granted PHLX's motion to consolidate the appeals and to hear and decide them on an expedited basis.

For the reasons set forth in this Opinion, we conclude that the Court of Chancery committed no legal error or abuse of discretion in approving the settlement, (including its definition of the settlement class) or in bifurcating its review of the settlement from its future consideration of issues relating to how the settlement proceeds should be allocated. Accordingly, we affirm.

### FACTS

**A. The Demutualization and The Strategic Investor Transactions**

The PHLX is the nation's oldest continuously operating securities exchange. In January 2004, the Exchange converted from a non-profit Delaware corporation that was owned by its 505 seat owners, to a for-profit Delaware corporation that was owned by its shareholders. In that conversion (the "Demutualization"), each seat owner was issued 100 shares of Class A common stock in exchange for their seat.[4]

In conjunction with the Demutualization, the PHLX adopted a restated Certificate of Incorporation, Article IV of which provides that no one person or related persons may own more than 20% of the Exchange's outstanding shares. "Related persons" are defined as "any two or more Persons that have any agreement, arrangement or understanding (whether or not in writing) to act together for the purpose of acquiring, holding, voting or disposing of shares of Common Stock." The purpose of this provision was to prevent a large stockholder from obtaining control of the Exchange.

After the Demutualization, in late 2004 and in 2005 the PHLX commenced discussions with different parties about a sale of either the Exchange or of some of the Exchange's assets. In 2005, Archipelago Holdings, LLC ("Archipelago") offered $50 million dollars to acquire all of the PHLX stock. That offer translated to $990 of Archipelago stock for each share of PHLX. In April 2005, the PHLX Board of Governors, on the recommendation of a special committee, rejected Archipelago's offer as "inferior to other alternatives available to the PHLX and as not in the best long-term interests of PHLX's shareholders."

The Board then proceeded to explore other strategic alternatives, all aimed at

---

**3.** The Appellants fall into two separate groups: (i) the "Settlement Appellants," who challenge the Court's approval of the settlement (Case No. 615, 2007), and (ii) the "Certification Appellants," who challenge the Court's class action determination and class certification (Case No. 613, 2007). (The Settlement and/or the Certification Appellants are sometimes referred to herein as the "Ob-

jectors" or the "Appellants.") The Appellees are the Strategic Investors, the Exchange and the members of its Board of Governors, and the plaintiff shareholder class representative.

**4.** As a seat owner, the representative stockholder plaintiff, Chuck Ginsburg, received 100 shares of Class A common stock.

diversifying the base of PHLX's investors, which would also become long term business partners with incentives to deliver options revenue and unlock potential value in PHLX's other lines of business. That exploration led to the Strategic Investor Transactions in the summer of 2005. In those transactions, the Exchange sold 45% of the equity of the PHLX to the six Strategic Investors, who also received warrants entitling them to an additional 44.4% of the PHLX's equity in 2006 if certain performance criteria were fulfilled. All of the Strategic Investors exercised those warrants in 2006. These transactions increased the Strategic Investors' ownership interest in the Exchange to 89.4%, and diluted the Class A shareholders' ownership interest to 10.6%. All told, the Strategic Transactions yielded approximately $40 million of new investment in the Exchange, but allowed the former seat owners to retain their 50,500 Class A shares.

Using the proceeds from the Strategic Investor Transactions, the Exchange made a self-tender, in September 2005, for 16,700 of the 50,500 outstanding Class A shares at $900 per share. The disclosure accompanying the self-tender described the Strategic Investment Transactions and indicated that as a result of those transactions, the book value of PHLX was reduced from $949.18 to $172.64 per share; and that if the tender offer were successful, the book value would be further diminished to $147.22 per share. The tender offer closed in October 2005, and 3,600 shares of Class A stock were tendered.

### B. *The Chancery Class Action*

On June 6, 2006, a Class A shareholder brought this class action against the Exchange, its Board, and the Strategic Investors, seeking rescission of the Strategic Investor Transactions or, in the alternative, rescissory damages, attorneys' fees and costs. The initial class complaint asserted claims for breach of fiduciary duty by the individual Board members in approving the Strategic Investments, and claims that the Strategic Investors aided and abetted those alleged breaches of fiduciary duty. On June 9, 2006, the plaintiff moved to expedite the proceedings and enjoin preliminarily the Strategic Investor defendants from further exercising the warrants and diluting the class A shareholders. The Chancellor denied the plaintiff's motion to expedite on June 14, 2006.

In July 2006, after all six Strategic Investors had exercised their respective warrants, the plaintiff amended the initial class complaint to add allegations relating to the Strategic Investors' ability to control PHLX by aggregating their equity interest, in violation of Article IV of the PHLX Certificate. Thereafter, the defendants moved to dismiss the amended complaint for failure to state a claim. The Chancellor denied those motions in December 2006, finding that the amended complaint stated a direct (and not derivative) claim for relief under Article IV.[5]

In March 2007, the class plaintiff moved for class action determination. On May 11, 2007, after full briefing, the Chancellor determined that the action was eligible to proceed as a class action on behalf of all injured parties. The Court provisionally certified "a class of all Class A common stockholders of the [PHLX] on April 20, 2005,[6] and their transferees or successors in interest." On May 30, 2007, a notice of

---

5. The Court specifically noted that "the issue that ... lies at the heart of this case" is whether the defendants "worked together ... in order to arrange the sale of control of [PHLX] ... [in which case] ... the fiduciary duty claim would appear to stem from a breach of Article 4."

6. April 20, 2005 is the date the Exchange's Board rejected the Archipelago offer.

the pendency of the class action was circulated to class members, disclosing that holders and transferees were included in the class.

After merits and expert discovery was concluded, the defendants moved for partial summary judgment challenging the availability of rescissory damages. The motion was denied on May 31, 2007. Urging that the Strategic Investor Transactions had been consummated independently to save the Exchange, which at that point was on the verge of bankruptcy, the Strategic Investors and the PHLX again moved for summary judgment. The Chancellor denied the motion of Strategic Investor UBS on June 11, 2007. Briefing on the remaining motions was deferred until after trial, which was scheduled to begin on June 18, 2007.

After the denial of UBS's motion for summary judgment, the parties held a mediation before Vice Chancellor Stephen P. Lamb pursuant to Court of Chancery Rule 174. The parties submitted their pre-trial briefs and key trial exhibits to the mediator, and after several days of intense mediation, an agreement in principle was reached. On June 20, 2007, the parties and Vice Chancellor Lamb signed a Memorandum of Understanding ("MOU"), under which all claims asserted in the action would be fully settled. The settlement would include "a release to the broadest extent possible under law." In exchange, the Strategic Investors agreed to return 14% of the shares acquired by them in the Strategic Investor Transactions; the CEO of the Exchange agreed to the cancellation of 14% of the restricted stock units awarded him under the PHLX management compensation plan; the Exchange agreed to pay $17.1 million cash into a settlement fund, primarily for payment of attorneys' fees; and the plaintiff class was guaranteed certain protections against future stock dilution.

## C. *The Settlement and Objections Thereto*

During the summer of 2007, class counsel and the defendants negotiated a definitive settlement agreement, including the scope of the release, based upon the terms of the MOU. The parties also requested the Court of Chancery to determine whether entities owned by the individual defendants should be excluded from the definition of the class. On August 29, 2007, the Chancellor entered an order revising the provisional class definition to include partners and stockholders of entities affiliated with the individual defendants, but prohibiting the individual defendants from recovering through those entities. As thus revised, the class definition for purposes of the settlement included:

> [A]ll Class A common stockholders of [PHLX] on April 20, 2005 [the date the Archipelago offer was rejected], and their transferees or successors in interest through June 20, 2007 [the date of the MOU], except (i) defendants; (ii) defendants' immediate family members; (iii) defendants' employees other than PHLX employees below the level of First Vice President; and (iv) defendants' affiliates, provided that non-defendant partners or owners of business entities that held Class A stock on April 20, 2005 shall be entitled to be members of the class to the extent of their ownership interest in the business entities (as if they held their ownership interests in their own names).

On September 4, 2007, the parties filed a Stipulation of Settlement with the Court of Chancery. The plaintiff sought to present the settlement for Court approval immediately, and present a plan of allocation for approval thereafter. The Chancellor approved the proposed bifurcation and entered a scheduling order. On September

11, 2007, a notice of the settlement, of the settlement hearing, and of the revised class definition was circulated to the class members.

After receiving the notice, certain class members, including Susquehanna International Group,[7] objected to the settlement. The objections fell into essentially five categories: (i) objections to the value of the settlement as a whole; (ii) objections to the proposed bifurcation of the settlement approval process; (iii) objections to the scope of the release; (iv) objections to the fitness of the class representative and class counsel; and (v) objections to the class definition. Upon agreeing to certain confidentiality provisions, the Objectors were provided copies of the MOU and the briefs and exhibits that had been submitted previously to the mediator. In addition, certain Objectors deposed one of the class counsel and all objectors were furnished a transcript of his deposition. The objections were then briefed and argued before the Chancellor at a lengthy hearing held on October 22, 2007.

At the conclusion of the hearing, the Chancellor, in a bench ruling, approved the settlement and overruled the objections. Specifically, the Chancellor determined that: (1) the requirements for class certification under Chancery Rules 23(a) and 23(b)(1) and (b)(2) had been satisfied; (2) the proposed bifurcation of the settlement approval process in these circumstances was permissible and appropriate;[8] and (3) the settlement itself was fair and reasonable, both economically and procedurally. The Chancellor entered a Final Order and Judgment that same day.

These appeals followed.

7. Susquehanna International Group, Inc. ("Susquehanna") is the Exchange's largest single stockholder who held Class A stock from and after the Strategic Investor Transactions.

## ANALYSIS AND DISPOSITION OF THE OBJECTIONS TO THE SETTLEMENT

### A. Overview of The Objections

In this Court the Objectors advance a plethora of substantive and procedural objections to the settlement that total fourteen separate (although in some cases interrelated) claims of error. Except for three contentions that were not fairly presented at the settlement hearing, the claims of error may be grouped into four analytical categories: (1) objections related to bifurcating the approval of the settlement from the determination of how the settlement proceeds should properly be allocated; (2) objections related to the procedural and economic fairness of the settlement (excluding issues relating to class certification and the release); (3) objections relating to certification of the class; and (4) objections related to the scope of the settlement release. We address each of these sets of claims in the order enumerated.

### B. Objections That Were Not Fairly Presented At The Settlement Hearing

The Certification Appellants advance on appeal two objections to the settlement that were not fairly presented to the Court of Chancery.

The first is the argument that the settlement was fatally flawed because it would compromise the plaintiffs' claim that the PHLX Board members breached their fiduciary duty to the initial Class A shareholders by approving the transfer of control of PHLX to the Strategic Investors, in violation of Article IV of the PHLX Certif-

8. The Court determined, in that respect, that the request for attorneys' fees and other requested fees would be deferred until the plan of allocation had been submitted to the Court for approval.

icate.[9] Because conduct in violation of the corporate charter is void as a matter of law, Certification Appellants urge, this claim cannot lawfully be settled absent unanimous approval of all PHLX stockholders, which is absent here.

■ This argument was never fairly presented to the Court of Chancery, as Supreme Court Rule 8 requires. Indeed, this claim was not presented at all until it first surfaced in the Certification Appellants' reply brief on this appeal. Rule 14(b)(vi)(2) of this Court provides that "[t]he merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal." Accordingly, we decline to address the merits of this claim.[10]

■ The Certification Appellants also claim that the Chancellor erroneously certified a class whose definition is overbroad because it includes persons and entities that purchased their shares after August 16, 2005. This objection was not fairly presented to the trial court as Rule 8 of this Court requires.[11] Issues relating to class certification and the class definition were briefed by the parties to the lawsuit, and were carefully considered by the Chancellor, on three separate occasions: (i) at the entry of the provisional certification order on May 11, 2007; (ii) as part of that Court's consideration of whether entities owned by the individual defendants were properly excluded from the class on August 29, 2007; and (iii) at the entry of the final class determination order following the settlement hearing on October 22, 2007. Class members received two notices—one in May 2007 and the other in September 2007—regarding the class determination, the appointment of Chuck Ginsburg as class representative and the selection of class counsel. No Objector ever objected to the class definition or its inclusion of transferees before this appeal.[12]

9. That provision (to reiterate) prohibits one person or related persons from owning more than 20% of the Exchange's outstanding shares. The class plaintiffs claim that the Strategic Investors were "related persons," thereby rendering a sale of control to the Strategic Investors invalid under the PHLX charter.

10. The merit of that claim, in any event, is highly doubtful. There has been no adjudication that the Strategic Investor Transactions violated the PHLX charter. The settlement would compromise only an unadjudicated claim that those transactions were void. Even had there been an adjudicated charter violation, the Certification Appellants have not established that any such violation would have constituted a legally void act. Finally, there is no merit to the claim that unanimous shareholder approval would be required to settle the charter violation claim. Although waste of assets is a breach of fiduciary duty that cannot be ratified except by unanimous shareholder approval, the Delaware courts have approved settlements of claims for waste of assets and even for violation of charter

provisions. See, e.g., Nottingham Partners v. Dana, 564 A.2d 1089, 1093 (Del.1989).

11. The Certification Appellants also advance a separate, and somewhat overlapping, objection that was presented in the proceedings below-the claim that the certified class is impermissibly overbroad because it includes "transferees and successors in interest" of persons who were shareholders on April 20, 2005. We address that claim elsewhere in this Opinion.

12. Rule 14(b)(vi)(A)(1) of this Court requires the appellants to make "a clear and exact reference to the pages of the appendix where [they] preserved each question in the trial court." In this connection, Certification Appellants cited A289, which discloses a possible objection (contained in a preliminary statement intended to provide notice of possible objections) relating to an alleged "change in class definition to include ... persons who purchased stock after the alleged breaches of fiduciary duty had occurred." That potential objection, however, was never pursued in the briefing in connection with the settlement

■ The Settlement Appellants also advance two claims that were not fairly presented to the Court of Chancery. First, these Objectors contend that the Notice of Pendency of Class Action was inadequate, but they do not identify any specific omissions. Second, they contend that the Settlement Notice was defective because it did not inform the class of (i) the magnitude, or the impact on the settlement, of the awards of restricted stock units (RSUs) to certain members of the PHLX senior management under the Exchange's management equity plan; and (ii) the magnitude of the severance payments (including "golden parachutes" and pension payments) that PHLX management will receive upon the sale of PHLX to Nasdaq. Because they are raised for the first time on appeal, we decline to consider these claims as well.[13]

## C. Objections Related To Bifurcation Of The Settlement Approval Process

We turn next to the claims relating to the bifurcation of the settlement approval process. The Objectors claim that the Chancellor's adoption of a bifurcated settlement approval process abridged their rights of due process, because the Court's "fail[ure] to address the intraclass conflict and lack of cohesiveness ... until the hearing on allocation of the award to the

class in the hope that class counsel could resolve those issues ... was error [since] the [Court of Chancery] had an independent duty to the absent class members to ensure that they received due process." The Objectors further argue that bifurcation constituted an abuse of discretion because it prevented them from knowing what their individual recovery from the settlement would be.

■ We address the bifurcation issues first, because the Objectors contend that the Chancellor could not properly assess the fairness of the settlement, irrespective of its economic merits, without also determining how the settlement proceeds should properly be allocated among the persons found entitled thereto. To the extent this argument raises a due process question, that is an issue of law which this Court reviews de novo.[14] Objectors' remaining objections to bifurcation are reviewed for an abuse of discretion.[15]

■ The Objectors cite no authority that would prohibit a trial court, on constitutional or any other grounds, from approving a settlement without simultaneously approving the propriety of a plan of allocation. Nor have we located any authority for that proposition. That comes as no surprise, since bifurcated class action settlements have been approved by the Delaware and the federal courts.[16] As the

hearing or at the hearing itself. Accordingly, this objection was never fairly presented to the Court of Chancery, and is thus deemed to have been waived.

13. The Notice of Settlement discloses all the information needed for class members to make an informed decision regarding the fairness of the settlement, apart from allocation of the proceeds. The Notice contains a description of the lawsuit, the consideration for the settlement, the location and time of the settlement hearing, and informs class members that additional information can be obtained by contacting class counsel. Thus, the Notice "fairly apprise[s] the prospective members of the class of the terms of the proposed

settlement and of the options that are open to them in connection with the proceedings." Wal–Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 114 (2d Cir.2005). See also In re Cendant Corp. Sec. Litig., 109 F.Supp.2d 235, 254 (D.N.J.2000).

14. Hercules Inc. v. Leu Trust and Banking (Bahamas) Ltd., 611 A.2d 476, 481 (Del.1992).

15. In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 145, 170 (2d Cir.1987).

16. See Frazer v. Worldwide Energy Corp., 1991 WL 74041 at *5, 1991 Del. Ch. LEXIS 78 at *17 (approval by the Court of Chancery of a partial settlement despite the absence of a

Second Circuit stated in *In re "Agent Orange" Product Liability Litigation,* there is:

> no absolute requirement that ... a plan [of allocation] be formulated prior to notification of the class.... [T]he prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case [which] can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement.[17]

At bottom, the Objectors' due process argument rests upon the proposition that it was constitutionally improper to certify the settlement class as defined, because certain members of the class had potentially antagonistic interests. That claim lacks merit. Elsewhere in this Opinion, we conclude that in certifying the class as defined, the Chancellor did not abuse his discretion, because (*inter alia*) he explicitly held that should any intra-class conflict issues arise during the allocation process, those issues can and will be addressed at that stage.

 Lastly, the Objectors contend that the Chancellor's decision to bifurcate was an abuse of discretion because it prevented the class members from ascertaining from the settlement notice what the amount of their individual recovery will be. Since the amount of any class member's individual recovery has yet to be formulat-

ed, that argument is a truism that misses the point. A decision that a settlement will not include a plan of allocation is a matter of judicial discretion.[18] Here, bifurcating the complex allocation issues from the issues relating to the fairness of the aggregate settlement will afford the parties sufficient time to develop a workable allocation plan, while also enabling the Exchange to close its agreement to be purchased by Nasdaq under a tight transaction closing deadline. That transaction would benefit (at the very least) all current holders, which apparently represent over 50% of the class. In these particular circumstances, the Chancellor's decision to bifurcate was not an abuse—and indeed was a proper—exercise of his discretion.

Having rejected the Objectors' challenges to bifurcation of the settlement approval process, we turn to the fairness of the settlement itself.

**D.** *Objections Relating To The Fairness Of The Settlement (Apart From Allocation)*

 The Objectors next challenge the fairness of the settlement itself (excluding issues relating to class certification and the scope of the release) on both procedural and economic grounds. The Objectors argue that their procedural due process rights were violated because: (i) they were not afforded a right to opt out of the class, and (ii) the settlement was economically unfair. Because the settlement class was

---

17. 818 F.2d at 170 (internal citations omitted).

plan to allocate the settlement fund); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d at 170; *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 223–24 (5th Cir.1981), *cert. denied* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982); *accord, In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 177 F.R.D. 216, 231 (D.N.J.1997); *In re Johns–Manville Corp.,* 340 B.R. 49, 70 (S.D.N.Y. 2006); *In re Michael Milken & Assocs. Sec. Litig.,* 150 F.R.D. 57, 67 (S.D.N.Y.1993).

18. *See In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d at 168. *See also, Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1152–53 (8th Cir. 1999) (approving class notice that "stated the maximum aggregate amount that [the defendant] would pay to the class [but] did not say how this amount would be distributed among the individual members of the class.")

certified under Court of Chancery Rules 23(b)(1) and (b)(2), any opt-out right was entirely a matter of judicial discretion. A challenge to a trial court decision to grant or deny an opt-out right under these rules is reviewed for abuse of discretion.[19] A challenge to the intrinsic fairness of a settlement is also reviewed for abuse of discretion.[20]

■ The Objectors' procedural due process argument would have merit if this were a class action primarily "for money damages or other relief at law" under Rule 23(b)(3).[21] Here, however, the primary relief sought in the initial and amended complaints was equitable, specifically, the rescission of the Strategic Investor Transactions or, alternatively, rescissory damages. The relief afforded in the settlement is also primarily equitable—the return of 14% of the Class A shares acquired in those Transactions, the cancellation of 14% of Mr. Fruchter's restricted share units awarded under the PHLX management compensation plan; and the grant of certain assurances against future dilution. That equitable relief is valued at $82 million (or approximately 83%) of the $99 million total estimated value of the settlement. The remaining settlement consideration (which would constitute legal relief) is the $17.1 million to be contributed to a settlement fund primarily for payment of attorneys' fees. In these circumstances, it cannot be fairly argued that the trial court's declination to grant an opt-out right to the class was unconstitutional.

Nor can it fairly be argued that the Chancellor abused his discretion by not granting an opt-out right under Rule 23(b)(2). Importantly, any settlement of this litigation would have to afford the defendants "complete peace," that would include "a release to the broadest extent possible under law." Granting an opt-out right would leave the Objectors, who appear to hold over 40% of the Exchange's Class A shares, free to assert, against the defendants, the identical claims being settled in a different forum. That almost certain outcome would utterly defeat the purpose of the settlement, and was a risk that the defendants were not willing to take. Thus, the settlement must either be as broad in scope as the law would allow and bind all class members, or there would be no settlement. Given the economic benefits afforded by the settlement in relation to the perceived minimal value of the claims being surrendered, the Chancellor determined not to grant opt-out rights. The Objectors have not shown that decision to be other than a sound exercise of judicial discretion.

■ We reach the same conclusion about the economic fairness of the settlement, the challenge to which has little or no support in the record. On a motion to approve a settlement, the trial court is not required to try the case or decide the issues on the merits. Rather, "the court's function is to consider the nature of the claim, the possible defenses thereto, the legal and factual circumstances of the case, and then to apply its own business judgment in deciding whether the settlement is reasonable in light of these factors."[22] The Chancellor's "special role" in approv-

**19.** *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (holding that an opt-out right is constitutionally mandated only where the class is certified under Rule 23(b)(3)); *Nottingham Partners v. Dana,* 564 A.2d 1089, 1099 (Del.1989).

**20.** *Selfe v. Joseph,* 501 A.2d 409, 411 (Del. 1985).

**21.** *Shutts,* 472 U.S. at 811–12, 105 S.Ct. 2965. *See also Nottingham Partners,* 564 A.2d at 1098.

**22.** *Polk v. Good,* 507 A.2d 531, 535 (Del.1986) (citing *Rome v. Archer,* 197 A.2d 49 (Del. 1964)). *See also, Barkan v. Amsted Industries, Inc.,* 567 A.2d 1279, 1284–85 (Del.1989).

ing a class action settlement "contrasts sharply" with this Court's more limited role in reviewing such an approval.[23] It is "not our function to determine the intrinsic fairness of the settlement or to exercise our own business judgment respecting its merits. We limit ourselves solely to the question of an abuse of discretion by the trial court in exercising its business judgment."[24]

Measured by this standard, the Chancellor committed no abuse of discretion in finding that the settlement was intrinsically fair. The Chancellor correctly identified the applicable standards and articulated in detail the bases for his conclusion that the settlement provided a substantial benefit for the class. The Chancellor, who was highly familiar with the merits of the case from his intensive consideration of the issues, motions and pretrial briefs over an 18 month period, explicitly balanced the strength of the class claims against the overall value of the settlement ($99 million plus non-quantifiable benefits). Based on that analysis, the Court concluded, in its business judgment, that it was "ineluctably clear on the record ... [that the] ... settlement is fair because it achieves a significant and substantial monetary benefit for the class." Specifically, the Chancellor found that:

> The plaintiffs were this close.... They survived the motion to dismiss by the skin of their teeth, as we would say in Sussex County. And then they survived the motion for summary judgment right on the eve of trial, very close call again.... That's what I can tell you about your case, having only lived with it for about a year-and-a-half.

\* \* \*

It seems to me undisputable that this settlement achieved a significant monetary benefit for the class of shareholders of [PHLX].... Those determinations in the market, such as it is, are the only real guidance that the Court can rely on. But coupled with what the expert testimony would have been at the trial and the experts' reports, it seems to me undeniably clear that there was a significant benefit with respect to the turning back of ... these [55,257] shares ... from the [S]trategic [I]nvestors, the cancellation of Mr. Frucher's interest of 14 percent, as well as the contribution of roughly $17 million in cash.

[The settlement] fairly surrenders potential claims in return for a compromise that the defendants won't assert defenses that I think were extremely strong.... At the end of the day, we would have had a very difficult trial in this courtroom, with dozens of witnesses sitting at my elbow, telling me there was no collusion.... They all had independent counsel; they all had independent experts; and they all went about this in their own self-interested manner. That would have been part of the testimony offered here.... Then I would have heard the testimony of half a dozen or more experts ...—and with resumes yards long—opining as to exactly why [PHLX] was worth more as a result of all these transactions, rather than less; and I would have had to sort out whether the plaintiffs really had any injury or damage here to complain about, which would have been another time consuming and difficult process. And I am not at all confident that in the end I would have been willing to rule in favor of the plaintiffs.

"[F]or this Court to set aside a settlement which has been found by the Court

**23.** *Kahn v. Sullivan*, 594 A.2d 48, 63 (Del. 1991).

**24.** *Polk v. Good*, 507 A.2d at 536.

of Chancery to be fair and reasonable, the evidence in the record must be so strongly to the contrary that the approval of the settlement constituted an abuse of discretion."[25] The Objectors here cite no evidence "strongly to the contrary." Indeed, they cite no evidence at all which contravenes the finding that the settlement would confer substantial economic benefit upon the class, in exchange for surrendering claims of considerably doubtful merit and, thus, of minimal value. We uphold the Chancellor's determination that the settlement is intrinsically fair from an economic standpoint.

\* \* \*

Having addressed the objections to the economic aspects of the settlement, we address the Objectors' challenges to the settlement's non-economic aspects. There are two sets of objections: those relating to class certification (which we address in Part E, *infra*, of this Opinion) and those challenging the scope of the release (which we consider in Part F, *infra* ).

### E. *Objections Relating To Class Certification*

▮▮▮ The Objectors claim that the Chancellor erroneously certified the settlement class because: (1) the class, as defined, impermissibly includes transferees of Class A shareholders as well as shareholder subgroups with conflicting interests; and (2) neither the named plaintiff nor class counsel, both of whom are conflicted, can adequately represent the class.

Therefore, the Objectors argue, this Court should reverse the class certification order and remand the case to the Court of Chancery with instructions that the class be decertified or, alternatively, subdivided into separate subclasses, each represented by separate counsel. To the extent the Objectors contend that the Chancellor formulated incorrect legal precepts or applied those precepts incorrectly, this Court reviews those claims *de novo*.[26] To the extent the Objectors claim that the Chancellor improperly approved a class definition, we review for abuse of discretion.[27]

1. *The Asserted Overbreadth Of The Class Definition*

(a) *The Inclusion of Transferees in the Class*

The Chancellor's Order and Final Judgment certifies a class that relevantly includes "all class A common stockholders of the [Exchange] ... on April 20, 2005, and their transferees or successors in interest through June 20, 2007...." This class definition is claimed to be fatally flawed because it includes transferees of persons who owned Class A shares at the time of the alleged wrongdoing, and because it includes groups that have inherently conflicting interests. None of these arguments is sufficient to preclude certification of the class as defined in the Final Order.

▮▮▮ We start with the proposition that it is commonplace for a certified class to include persons who held shares as of a given date, "and their transferees, successors, and assigns."[28] The Objectors argue

---

25. *Kahn v. Sullivan,* 594 A.2d at 59.

26. *Payne v. Travenol Labs., Inc.,* 673 F.2d 798, 810 (5th Cir.1982) (the "court's decision on the scope of the class can be overturned only for abuse of discretion").

27. *Leon N. Weiner & Assocs., Inc. v. Krapf,* 584 A.2d 1220, 1223 (Del.1991) ("Assuming a correct formulation by the trial court of the

legal precepts underlying Rule 23, our standard of review of the court's findings of fact, in application of those precepts to its ultimate determination, is whether they are supported by the record and the product of an orderly and logical deductive process.").

28. *In re Prodigy Communs. Corp. S'holders Litig.,* 2002 WL 1767543, at \*4 (Del.Ch.) ("[T]he law recognizes that when a claim is

that the certified class should not include transferees, because the holders at the time of the transactions have a greater interest in the claims being compromised in the settlement than do the subsequent transferees. Even if true, that would not establish that the Chancellor abused his discretion by including transferees within the class of persons who would be bound by the settlement. To exclude from the class any persons who contend that they have rights in the claims being settled, would create the risk that those persons would be free to sue in another forum—a risk that the Appellees are unwilling to take.

Nor did any rule of law require the Chancellor to impose that risk upon the Appellees. The case law supports his determination. For example, *In re Triarc Cos., Inc. Class and Deriv. Litig.*[29] involved a settlement of a shareholders class and derivative action. A person who held shares at the time of the alleged wrong but later sold those shares, objected to the settlement, which provided benefits only to the corporation. Those benefits were enjoyed indirectly by the current stockholders, but not at all by the former stockholders. The Court of Chancery held that the former stockholders could properly be bound to the settlement yet receive noth-

ing, because where "claims are weak or of little or no probable value . . . it is fair to bar those claims as part of the overall settlement." The Court also observed that "there is nothing unfair or unreasonable about a judgment that bars [a] later assertion of an insubstantial claim. . . ."[30] If, as is argued, the transferees' rights in the disputed claims are weak, the weakness of their rights will be taken into account in allocating the proceeds of the settlement, by distributing little (or possibly none) of the proceeds to them.[31]

In short, even if (as Objectors argue) the transferees' rights are insubstantial, that would not justify excluding the transferees from a judgment that would bar them from asserting claims against the settling defendants. Rather, that insubstantiality would give the Objectors grounds to argue, in the allocation proceeding, that the transferees should receive little or none of the settlement proceeds.

### (b) *Inclusion Within The Class Of Members Having Potentially Conflicting Claims*

 Court of Chancery Rule 23(a)(2) requires that in order to certify the class there must be questions of fact or law that are common to all members of the

---

asserted on behalf of a class of stockholders challenging the fairness of the terms of a proposed transaction under Delaware law, the class will ordinarily consist of those persons who held shares as of the date the transaction was announced and their transferees, successors and assigns."); *In re Triarc Cos., Inc. Class and Deriv. Litig.*, 791 A.2d 872, 878–79 (Del.Ch.2001) ("[I]t is commonplace for class certification orders entered by this Court in actions involving the internal affairs of Delaware corporations to define the relevant class as all persons (other than the defendants) who owned shares as of a given date, and their transferees, successors and assigns.")

**29.** 791 A.2d 872 (Del.Ch.2001).

**30.** *Id.* at 876, 879.

**31.** It is also commonplace for the Court of Chancery to include persons having weak claims in a settlement class, but to allocate little or none of the proceeds to them. *See, In re Resorts Int'l S'holders Litig.*, 1988 WL 92749, at *10–11 (Del.Ch.) (class definition bound certain objectors with weak rights, who received no benefit in the settlement); *In re Triarc*, 791 A.2d at 878–79 (certifying class that includes former holders and approving settlement that provides no benefit to former holders); *In re Prodigy*, 2002 WL 1767543, at *4 (certifying class that includes former holders, approving settlement that benefits only current shareholders and provides no benefits to class members who sold their shares).

class. That requirement is met "where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated." [32] That the class members may have "different interests and views" will not defeat commonality, so long as the common legal questions are not dependent on divergent facts and significant factual diversity does not exist among individual class members.[33] Here, the common issues of law and fact include (among others) whether the holdings of the Class A shareholders (or their successors and assigns) were improperly diluted by the Strategic Investor Transactions, and whether those Transactions were the product of a breach of fiduciary duty in violation of the PHLX Certificate. Thus, the complaint alleges that all class members were injured, some perhaps more than others, by the same events.

The Objectors contend, nonetheless, that the class definition is improper because it encompasses multiple constituencies—holders, buyers and sellers—whose interests may potentially come into conflict. That is so, Objectors argue, because those constituencies' differing circumstances and theories of recovery might result in one or more groups claiming the same or overlapping shares of a finite settlement recovery. But, the inclusion of these multiple constituencies and their potential for conflict does not, by itself and without more, preclude certification of the class. There are several reasons.

First, it is by no means clear that these constituencies will, in fact, be found to have conflicting claims to the settlement recovery.[34] Second, even if there were no settlement and the class was being certified for litigation purposes, the inclusion of holders, buyers and sellers within the class would not defeat certification, because the class could be subdivided at a later time to take those conflicts into account.[35] Third, because what has been certified is a settlement class, all that remains to be done is to formulate and then carry out the plan of allocation, subject to Court of Chancery

**32.** *Leon N. Weiner & Assoc.*, 584 A.2d at 1225 (quoting *Gordon v. Forsyth County Hospital Authority, Inc.*, 409 F.Supp. 708, 717–18 (M.D.N.C.1976)).

**33.** *Id.* (citing 3B *Moore's Federal Practice* ¶ 23.06–1 at 23–164–65).

**34.** It is at least arguable that only the Class A shareholders who were the original PHLX seatholders, or their successors in interest, could legitimately claim to have been diluted and thus entitled to participate in the 55,257 Class A share being returned. Were that argument to prevail, then the remaining class members would not be entitled to receive any of the returned shares. On the other hand, all class members would be entitled to the benefits of the corporate governance changes (the anti-dilution protections), the surrender of Mr. Frucher's restricted stock units, and the $17.1 million settlement fund to be utilized for payment of attorneys' fees and expenses. Any conflicting interests as among holders, buyers and sellers is at this point only potential, and will be found to exist, if at all, only at the allocation stage.

**35.** The Court of Chancery adopted this reasoning in *Emerald Partners v. Berlin*, 1991 WL 244230, at *3 (Del.Ch.), as follows:

It may very well be that it will eventually be shown that those stockholders who acquired their shares after the record date have claims differing from the claims of the stockholders who owned their shares on the record date, but that circumstance does not prevent class certification. There are other issues regarding the structure of the [transaction] that, regardless of the date a stockholder acquired his stock, are common to all the minority stockholders who held their stock on the date the merger was completed. These issues are sufficient to meet the commonality requirement for certification at this stage of the proceedings. If it later appears that differences in issues make it desirable to subdivide the class, it may be done.

review and approval. If during the course of that review it appears that different shareholder groups are advancing conflicting claims, that can be remedied by the Court dividing the class into subclasses, or by other means. The Chancellor so recognized:

> Now, that is putting to one side a difficult set of problems that are now going to arise—and I don't mean to diminish them—that is, the allocation of the benefit amongst the class members based on their different relative hardships, the injuries that they suffered because some are holders throughout the period, some bought during the period and held, some sold during the period, and some bought during the period and held beyond the period. That is not going to be an easy process.

> And if, at some point, any members of the class want to challenge the plaintiff's counsels' ability to do this fairly in a way that's objective and reasonable, and in a way that is conflict free, they know how to contact me and I am confident they will contact me. If they do, then I will try to remedy any potential or perceived conflict that may exist. I'm not suggesting that it does exist or that I agree that it exists. But if it should appear, I think that is something that the Court can remedy at a later point in time; and that is all I am trying to tell you now.

The Objectors are unable to identify any controlling legal authority that prohibited the Chancellor from certifying a settlement class that includes buyers, sellers and holders, or that required him to divide the class into subclasses at this stage.[36] Manifestly, a decision whether or not to certify a class or divide the class into subclasses calls for the sound exercise of discretion.[37] Here the Objectors have not shown that the Chancellor abused his discretion. Refusing to certify the class would have been tantamount to preventing the settlement from going forward. Establishing subclasses with separate counsel would have risked creating delays that could protract the approval of the settlement beyond the July 31, 2008 deadline. Certifying the class as defined, on the other hand, avoided these risks, yet preserved the option of creating subclasses during the allocation stage, should that become necessary.[38]

We conclude that the Chancellor committed no legal error or abuse of his discretion by certifying the class or by refus-

---

**36.** There is persuasive federal case law holding the contrary. *See, e.g., Clark Equipment Co. v. Int'l Union, Allied Indus. Workers of America, AFL–CIO et al.,* 803 F.2d 878, 881 (6th Cir.1986) (holding that class certification of union and nonunion employees in labor dispute, rather than dividing class into subclasses due to conflicts within class, was not an abuse of discretion given the employer's precarious financial condition and the fact that subclassing often leads to more complex and protracted litigation); *Lundquist v. Security Pacific Automotive Financial Services Corp.,* 993 F.2d 11, 15–16 (2d Cir.1993); *Culver v. City of Milwaukee,* 277 F.3d 908, 912 (7th Cir.2002) (holding that the fact that the class is overbroad and should be divided into subclasses is not in itself reason for refusing to certify the case as a class action; the pro-

posed class representative might be an adequate representative of the subclass to which he belongs, and the lawyer for the class might be able to interest a member of another subclass in becoming a representative of that subclass).

**37.** *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 184–85, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

**38.** *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 831–32, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) is an important reminder of the need to scrutinize with considerable care the issue of possible intra-class conflicts, including the possible creation of subclasses, during the allocation process.

ing to establish subclasses represented by separate counsel.

### 2. *The Asserted Inadequacy Of The Class Representative and Of Class Counsel*

The Objectors next claim that the Chancellor erred in certifying the class because the class representative, Chuck Ginsburg, and his class counsel, had conflicts that prevent them from adequately representing the class. The Objectors assert that class counsel "has been aligned from the very inception of this case" with Susquehanna, PHLX's largest single stockholder, which was "named in Plaintiff's pre-trial brief as not only one of the architects of the very wrong complained of herein but also a prime mover in getting the wrong underway." [39] Plaintiff Ginsburg cannot adequately represent the class, it is argued, because he is represented by conflicted class counsel, and also because he is a holder whose interests inherently conflict with those class members who are buyers and sellers. The Objectors further contend if any further demonstration of inadequacy were needed, it consists of the Chancellor's failure expressly to find that Ginsburg would be an adequate class representative, as *Prezant v. De Angelis*[40] required.

■■■■ To the extent that the Objectors claim that the Chancellor improperly failed to inquire into, and determine the adequacy of, the class representative and class counsel, our review is *de novo.* To the extent the Objectors claim that the Chancellor made erroneous findings of fact in reaching his adequacy determination, our standard of review is whether those findings are supported by the record and are the product of an orderly and logical reasoning process.[41]

#### (a) *The Adequacy of Class Counsel*

■■■■ The adequacy of class counsel is indisputably an important judicial consideration in the certification of a class.[42] Although the Objectors claim that class counsel have a conflict that fatally compromises counsel's ability adequately to represent the class, they present no evidence to support that position. Their claim that class counsel has been closely allied with Susquehanna, an "architect" of the allegedly wrongful scheme, from the outset, takes the form of a bare assertion in Settlement Appellants' brief with no citation to the record. Moreover, that argument cannot be reconciled with the undisputed fact that Susquehanna, supposedly a co-conspirator with class counsel, is an objector to the very settlement that class counsel negotiated and is now defending. Finally, the inadequacy argument fails to come to grips in any lawyerlike way with the Chancellor's finding that class counsel have vigorously and tenaciously advanced the interests of the class at each step of the litigation. Stating that the case was litigated by "very capable counsel," the Chancellor went on to find that:

> All I can tell you, from someone who has only been doing this for roughly 22 years, is that I have yet to see a more

---

**39.** Settlement Appellants' Opening Brief at 25. In their Reply Brief, Settlement Appellants also assert, again without any citation to the record, that class counsel decided to amend the class definition and to change their legal theory to proceed on a claim for breach of the PHLX Certificate provision, without notifying the members of the class. This constituted (Settlement Appellants argue) a breach of class counsel's duty of loyalty to the members of the plaintiff class. Settlement Appellants' Reply Brief at 15.

**40.** 636 A.2d 915, 924 (Del.1994).

**41.** *Leon N. Weiner & Assocs.,* 584 A.2d at 1223.

**42.** *Derdiger v. Tallman,* 773 A.2d 1005, 1011–12 (Del.Ch.2000).

fiercely and intensely litigated case than this case. Never in 22 years have I seen counsel going at it, hammer and tong, like they have gone at it in this case. And I think that's a testimony—Mr. Valihura [Delaware counsel for the Settlement Appellants] correctly says that's what they are supposed to do. I recognize that; that is their job, and they were doing it professionally.

The Objectors have presented no facts or evidence to controvert this finding. Accordingly, their attack upon the adequacy of class counsel must fail.

### (b) *The Adequacy of The Class Representative*

■■■■ The Objectors attack the adequacy of plaintiff Ginsburg as class representative, on two grounds. First, they argue, Ginsburg cannot be an adequate representative, because he is a holder whose interests inherently conflict with the interests of class members who are buyers and sellers. For the reasons previously discussed, if there are any conflicts, they are only potential (*i.e.,* may not actually develop), not inherent. And, if conflicts do materialize, they can be remedied in the allocation process. Such potential, contingent problems cannot disqualify plaintiff Ginsburg from serving as class representative for purposes of entering into the settlement and seeking court approval thereof.

The Objectors' second contention is that it was error to certify the settlement class with plaintiff Ginsburg as class representative, because the Chancellor never expressly determined, as *Prezant v. De Angelis* requires, that Ginsburg will adequately represent the class. The short answer is that in these circumstances there was no need for the Chancellor to do so, because the Court had previously

made such an express determination five months before, and no subsequent event had developed that required the Chancellor to revisit that issue.

■■■■ Of cardinal importance in certifying a settlement class is the requirement that the trial court expressly find that the named plaintiff can "fairly and adequately protect the interest of the class"[43] before it can approve a settlement of a class action. Indeed, our case law requires this finding as a matter of due process.[44] The Objectors' argument that the Chancellor failed to determine that plaintiff Ginsburg was an adequate class representative, overlooks a critical fact that fatally undermines their position. On May 11, 2007, while this case was being litigated "hammer and tong," and before any settlement of this action was within anyone's contemplation, the Chancellor entered an order determining that this action "shall be provisionally maintained as a class action pursuant to Court of Chancery Rules 23(a) and (b)(1) and (2) on behalf of a class of all Class A common stockholders of [PHLX] on April 20, 2005, and their transferees or successors in interest, except defendants and their affiliates, employees, and immediate family members; [and that] . . . (e) *the Class is adequately represented by counsel and that the representative party will fairly and adequately protect the interests of the Class.*"[45]

Had the Chancellor not previously—and expressly—determined that plaintiff Ginsburg would adequately represent the class for purposes of litigation, the Objectors' due process attack upon the settlement might have arguable merit. But where, as here, the Chancellor expressly made that adequacy determination in his initial certification order before any settlement was

---

**43.** Court of Chancery Rule 23(a)(4).

**44.** *Prezant v. De Angelis,* 636 A.2d at 923.

**45.** Order With Respect to Class Action Determination, B533–34 (emphasis added).

ever negotiated, that determination satisfied any Rule 23(a)(4) due process concern. Only if newly developed, post-certification events suggested the need to revisit that earlier finding would *Prezant* require a second look. Here, the Objectors have not identified, nor do they contend, that any new events arose post-certification that mandated a renewed express finding of Rule 23(a)(4) adequacy. Accordingly, there was no need for the Chancellor to make a second express finding in connection with certifying the class for settlement purposes.

\* \* \*

To summarize, we find no merit to the objections to the Chancellor's certification of the settlement class, and uphold his determinations in that regard.

### F. Objections To The Scope Of The Release

The final objection to the non-economic aspects of the settlement is that the scope of the release is impermissibly overbroad. Specifically, the Objectors argue that the Chancellor erred by approving a release that included all claims relating to the Demutualization, because as a matter of law those claims could not validly be released in this lawsuit. That is so, the

Objectors say, for three reasons: (i) the release may have a preclusive effect in related federal litigation, (ii) those claims are not the basis of any cause of action or claim for relief that was asserted in the complaint or litigated in the case, and were not made a subject of discovery; and (iii) those claims are not based on the "same operative facts" as the claims for relief asserted in the complaint. Because the essence of this objection is that the Chancellor incorrectly applied legal precepts to the relevant facts, our review is *de novo*.[46]

#### 1. Preliminary Observations

■ Before addressing these arguments, some preliminary observations are appropriate. In any settlement of litigation, including class actions, a release of claims is an essential, bargained—for element, with the defendants customarily seeking a release with the broadest permissible scope. But, the scope of a release of claims cannot be limitless, if only because of substantive due process concerns.[47] The general issues implicated here are what limiting principle dictates how inclusive the settlement class may be, and whether that limiting principle was properly applied to the facts at bar.

---

46. *Leon N. Weiner & Assocs.*, 584 A.2d at 1223.

47. *See Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 388, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (Ginsburg, J., concurring opinion) (*"Matsushita"*); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Delaware courts have long been mindful of the need for judicial scrutiny of settlement releases, to address overbreadth concerns. In *In re Advanced Mammography Systems, Inc. S'holders Litig.*, 1996 WL 633409 (Del.Ch.), former Chancellor Allen declined to enter an order releasing class claims that were to be dismissed on grounds of mootness. In a letter opinion the Chancellor stated:

.... [I]n the context of a claim that is acknowledged to be moot and in which no consideration is paid to the class, it is not appropriate for the court to purport to release any claims of the class. The *res judicata* effect of a dismissal based upon stipulation of mootness is whatever it may be, *but it would certainly offend fundamental notions of fairness* to purport, as the proposed order in this [case] does, to release claims that have never been advanced, that in some instances may belong to other entities that comprise the class (derivative claims), in which there appears to be no serious discovery record in any event, and most importantly, in exchange for no consideration.
1996 WL 633409, at *1 (underlining added).

 In Delaware, the limiting principle is that a settlement can release claims that were not specifically asserted in the settled action, but only if those claims are "based on the 'same identical factual predicate' or the 'same set of operative facts' as the underlying action." [48] As this Court stated in *Nottingham Partners*:

> [I]n order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not even been presentable in the class action.[49]

Thus, it follows that:

> [A] release is overly broad if it releases claims based on a set of operative facts that will occur in the future. If the facts have not yet occurred, then they cannot possibly be the basis for the underlying action.... Additionally, a release may be overbroad if it could be interpreted to "encompass any claim that has *some* relationship—however remote or tangential—to any 'fact,' 'act,' or conduct 'referred to' in the Action." In other words, a release is overly broad if it releases claims based on a common set of tangential facts, as opposed to operative or core facts.[50]

 The release approved by the Chancellor as part of the settlement was very broad in scope. In relevant part it included all claims:

> .... based on any conduct that occurred prior to the date of this Stipulation against any Defendant–Related Releasees, whether or not any such Defendant–Related Releasees were named, served with process, or appeared in this Action, which have arisen, could have arisen, arise now, or may hereafter arise out of, or relate in any manner to the claims .... involved, or set forth in, or referred to or otherwise related, directly or indirectly, in any way to, this Action or the subject matter of this Action, and including without limitation any claims (whether or not asserted) in any way related to: (i) Demutualization; (ii) [PHLX's] decision to reject a business combination with Archipelago; (iii) [PHLX's] consideration of any merger, acquisition, joint venture, business combination, initial public offering, or other strategic initiatives or transactions involving [PHLX] as an alternative to a business combination with Archipelago or the Strategic Investments; (iv) the Tender Offer; (v) the value or valuations of [PHLX] done in connection with (iii); (vi) any question of Board or management compensation and Board reorganization prior to December 31, 2006; and/or (vii) the Strategic Investments (including expressly any alleged violations of Article IV of [PHLX's] Certificate of Incorporation); and/ or (viii) any and all alleged breaches of fiduciary or

**48.** *UniSuper, Ltd. v. News Corp.*, 898 A.2d 344, 347 (Del.Ch.2006) (quoting *Nottingham Partners*, 564 A.2d at 1106). Although the phraseology of these concepts ("identical factual predicate" and "same set of operative facts") may be different, their substantive meaning is the same.

**49.** *Nottingham Partners*, 564 A.2d at 1106 (internal citations omitted, quoted with approval

in *Matsushita*, 516 U.S. at 376–77, 116 S.Ct. 873) (citing *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir.1982)).

**50.** *UniSuper, Ltd. v. News Corp.*, 898 A.2d at 347 (quoting *Green v. Phillips*, 2000 WL 33521109, at *1 (Del.Ch.)) (emphasis in original).

other duties of the Defendant–Related Releasees. . . . .

Despite the breadth of the foregoing release, the Settlement Appellants object to its language only insofar as it would release claims relating to "Demutualization." Moreover, no one disputes the governing legal principle; *i.e.*, all parties agree that Demutualization claims can be released as part of this settlement if they are based upon the same operative facts (or identical factual predicate) as the claims actually being asserted in this action. The issue, therefore, is simply stated: are the Demutualization claims based on the same operative facts as the claims asserted in the complaint? The Chancellor concluded that they are and we agree.

### 2. *Analysis of Appellants' Objections*

The Objectors advance three reasons why the Demutualization claims could not be validly included within the scope of the release: (1) the release may have preclusive effect in related federal litigation;[51] (ii) the Demutualization claims are not the basis for any cause of action asserted in the complaint, actually litigated, or made a subject of serious discovery; and (iii) those claims are not based on the "same operative facts" or "identical factual predicate" as the claims for relief that are asserted in the complaint.

The Objectors' first two arguments are readily disposed of. First, whether or not releasing the Demutualization claims will have preclusive effect in the related federal litigation is not an issue for this Court or the Court of Chancery to decide. As the United States Supreme Court observed in *Matsushita*, "[a] court conducting an action cannot predetermine the res judicata effect of the judgment; that effect can be tested only in a subsequent action[;]"[52] *i.e.*, by the federal courts where those actions are pending.

Second, there is no legal requirement that the Demutualization claims be the subject of a claim for specific relief or that they be actually litigated in order to be released.[53] Moreover, as a factual matter (and contrary to the Objectors' position), the Demutualization was both the subject of claims of wrongdoing in the complaint and of intensive pretrial discovery. The amended complaint alleges that the former seat holders were induced to vote for the Demutualization by assurances that turned out to be misleading and coercive, including the assurance that upon Demutualization no parties acting in concert could control the PHLX, the assurance that management would not carve out an equity stake for itself as part of that transaction, and by the disclosure that a

**51.** As of the date of the appeals, related federal litigation included: (i) *McGowan Investors, L.P. et al. v. Frucher, et al.*, 481 F.Supp.2d 405 (E.D.Pa.2007) (federal securities claims dismissed for failure to state a claim; Third Circuit appeal pending); (ii) *McGowan Investors, L.P. et al v. Keefe Bruyette & Woods, Inc. et al*, 540 F.Supp.2d 571 (E.D.Pa.2008) (federal securities and RICO claims against PHLX's investment banker arising from Demutualization and Strategic Transactions; motion to dismiss pending); (iii) *Pennmont Sec. v. DiDonato, et al.*, No. 06–1646, 2008 WL 834379 (E.D.Pa.) (insider trading claim against Frucher arising out of allegedly improper disclosures regarding negotiations with Archipelago and the Strategic Investors); and (iv)

*Penn Mont Sec. v. Frucher, et al.*, 502 F.Supp.2d 443 (E.D.Pa.2007) (RICO and other claims against PHLX governors and officers arising from conduct from the Demutualization through the Strategic Transactions; dismissed for failure to state a claim).

**52.** 516 U.S. at 396, 116 S.Ct. 873. The Chancellor properly rejected the Objectors' contention on this basis, holding that "[w]hether or not this has the res judicata effect that it purports to have with respect to claims outside of this case is for another court and another judge to decide."

**53.** *Nottingham Partners*, 564 A.2d at 1106.

substantial capital funding fee would be re-instituted should the Demutualization vote fail. Moreover, the complaint alleges that management distributed to the seat owners a restated certificate of incorporation and by-laws that were adopted without the prior approval of a majority of the holders of the outstanding shares. In addition, the Demutualization was the subject of document discovery requests, interrogatories, and deposition questions of PHLX witnesses.

The Objectors' third argument squarely addresses the relevant issue, which is whether the Demutualization claims arise out of the same set of operative facts as the claims that form the subject of claims for relief. We conclude that they were. Demutualization was a fact upon which those claims for relief were predicated. Demutualization enabled the PHLX defendants to enter into the Strategic Investor Transactions. The claims for breach of fiduciary duty based on violations of the Article IV prohibition against ownership concentration greater than 20% (and the associated aiding and abetting claims) arose out of the Demutualization in which that Certificate provision was created.[54]

In short, the Demutualization was not a transaction that was "unrelated" or "tangential" to or "remote" from the conduct that forms the basis for the specific claims for relief asserted here. Besides being the subject of claims of wrongdoing (although not wrongdoing for which specific relief was requested), the Demutualization was also the "but for" factual foundation of the conduct that does form the subject of the claims for relief. Therefore, the Chancellor committed no legal error in determining that the Demutualization claims arose out of the same set of operative facts as the claims for relief that were actually asserted.

## CONCLUSION

For the reasons set forth, the Order and Final Judgment of the Court of Chancery approving the settlement of these consolidated actions is affirmed. The mandate shall issue immediately.

---

**54.** The Settlement Appellants, in a separate argument, assert that the release is overbroad because it releases claims that predate the class period and that, therefore, do not belong to the class. Settlement Appellants' Op. Br. at 33–34. Although these Objectors do not specifically refer to the Demutualization claims, presumably that is what they have in mind, since those claims arose before the beginning of the class period. To dispel any unnecessary due process concerns, we address that argument.

The short answer is that although the Demutualization claims being released predate the class period, those claims do belong to the class, specifically, to the former seat holders who became Class A shareholders in the Demutualization. To the extent that those former seat holders fit within the class as defined in the Final Order, they are members of the class and as such are entitled to release the Demutualization claims. To assure that these particular class members will receive fair consideration for their release of those claims, the Court of Chancery, during the allocation phase, would have to: (i) determine the value of those claims for settlement purposes and then (ii) allocate an appropriate portion of the settlement proceeds to those specific class members.