NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-3980

MCGOWAN INVESTORS LP; TIM LOBACH; STEPHEN J.
CHESELDINE; MARKET STREET SECURITIES, INC.,
ON BEHALF OF THEMSELVES AND ALL OTHER PHLX
SEAT OWNERS AS OF DEMUTUALIZATION INFO DATE,

Appellants

v.

MEYER (SANDY) FRUCHER; ORMAN STEISEL; MICHAEL
JUNEMAN, MEMBER PHLX BOARD OF GOVERNORS; JOHN
F. WALLACE, MEMBER PHLX BOARD OF GOVERNORS;
DANIEL B. O'ROURKE, MEMBER PHLX BOARD OF
GOVERNORS; MICHAEL J. CURCIO, MEMBER PHLX BOARD
OF GOVERNORS; CONSTANTINE PAPADAKIS, PH.D.,
MEMBER PHLX BOARD OF GOVERNORS; I. ISABELLE
BENTON, MEMBER PHLX BOARD OF GOVERNORS; CHARLES
P. PIZZI, MEMBER PHLX BOARD OF GOVERNORS; DANIEL
BIGELOW, MEMBER PHLX BOARD OF GOVERNORS; LARRY
L. PRESSLER, ESQ., MEMBER PHLX BOARD OF GOVERNORS;
KEVIN KENNEDY, MEMBER OF PHLX BOARD OF GOVERNORS;
RICHARD SKLAR, MEMBER PHLX BOARD OF GOVERNORS;
KEVIN CARROLL, MEMBER PHLX BOARD OF GOVERNORS;
GENE SPERLING, MEMBER PHLX BOARD OF GOVERNORS;
CHRISTOPHER R. CARTER, MEMBER PHLX BOARD OF GOVERNORS;
WILLIAM STALLKAMP, MEMBER PHLX BOARD OF GOVERNORS;
ALBERT S. DANDRIDGE, III, ESQ., MEMBER PHLX BOARD
OF GOVERNORS; WENDY S. WHITE, ESQ., MEMBER PHLX
BOARD OF GOVERNORS; PETER C. ERICHSEN, ESQ., MEMBER
PHLX BOARD OF GOVERNORS; GARY E. YETMAN, MEMBER PHLX
BOARD OF GOVERNORS; WYCHE FOWLER, JR., MEMBER PHLX
BOARD OF GOVERNORS; ELEANOR W. MYERS, ESQ., MEMBER
PHLX BOARD OF GOVERNORS; MERRILL, LYNCH, PIERCE,

FENNER & SMITH, INC.; CITADEL DERIVATIVES GROUP, LLC; MORGAN STANLEY & CO INCORPORATED; UBS SECURITIES, LLC; CITIGROUP FINANCIAL PRODUCTS, INC; CREDIT SUISSE FIRST BOSTON NEXT FUND, INC.; JOHN L. CANTWELL, JR., MEMBER PHLX BOARD OF GOVERNORS, ISAAC C. HUNT, JR.

---

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 06-cv-02558)
District Judge: Honorable Anita B. Brody

---

Argued January 14, 2010

Before: AMBRO, CHAGARES, and STAPLETON, <u>Circuit Judges</u>

(Opinion filed: August 12, 2010)

Steven B. Mirow, Esquire (Argued)
249 South 12th Street
Philadelphia, PA   19107-0000

    Counsel for Appellants

Adam M. Finkelstein, Esquire
Stephen J. Kastenberg, Esquire (Argued)
Paul Lantieri, III, Esquire
Edward D. Rogers, Esquire
Ballard, Spahr, Andrews & Ingersoll
1735 Market Street, 51st Floor
Philadelphia, PA   19103

Jay B. Kasner, Esquire
Skadden, Arps, Slate, Meagher & Flom
4 Times Square
New York, NY   10036-0000

Paul J. Lockwood, Esquire
Skadden, Arps, Slate, Meagher & Flom
05-01
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0000

Kristen V. Grisius, Esquire
Stephen J. Senderowitz, Esquire
Winston & Strawn
35 West Wacker Drive, Suite 4200
Chicago, IL   60601-0000

Jack L. Gruenstein, Esquire
Vaira & Riley
1600 Market Street, Suite 2650
Philadelphia, PA   19103-0000

Frances E. Bivens, Esquire
John B. Gaffney, Esquire
Davis, Polk & Wardwell
450 Lexington Avenue
New York, NY   10017-0000

Scott A. Edelman, Esquire
Robert C. Hora, Esquire
Stacey J. Rappaport, Esquire
Milbank, Tweed, Hadley & McCloy
One Chase Manhattan Plaza
New York, NY   10005-0000

C. Paul Scheuritzel, Esquire
Larsson & Scheuritzel
1500 Market Street
Centre Square West, Suite 3510
Philadelphia, PA 19102-0000

John G. Harkins, Jr., Esquire
Eleanor M. Illoway, Esquire
Harkins Cunningham

3

2005 Market Street
2800 One Commerce Square
Philadelphia, PA   19103-0000

Daniel Segal, Esquire
Hangley, Aronchick, Segal & Pudlin
One Logan Square
18th & Cherry Streets, 27th Floor
Philadelphia, PA   19103-0000

   Counsel for Appellees

---

OPINION

---

AMBRO, <u>Circuit Judge</u>

This case involves the enforceability of a release that was negotiated as part of a court-approved settlement in a related state court action.  That settlement released not only state law claims, but also federal claims that could not have been brought in state court.  On appeal, the appellants argue that this settlement is not entitled to full faith and credit in federal court.  For the reasons that follow, we disagree and thus affirm the judgment of the District Court.

## I. FACTS

Until recently, the Philadelphia Stock Exchange was structured as a mutual organization with 505 "seats," each of which provided to designated "seat owners" both equity ownership and the right to trade.  In October 2003, the Exchange proposed a demutualization plan to its seat owners.  This plan was outlined in an Information

4

Memorandum, which included analysis by an independent financial advisor, Keefe

Bruyette & Woods ("KBW"). The Memorandum included KBW's conclusion that the

"viability of [the Exchange] in its current operating structure [was] questionable," and

that demutualization was the Exchange's best long-term option. S.A. 23-24. In addition,

prior to the demutualization vote the Exchange told its seat owners that it would later seek

additional investments in the Exchange. In November 2003, the seat owners approved

the demutualization plan, and the Exchange began to demutualize.

Under the plan, the seat owners received 100 shares of Exchange common stock

for each seat that they had previously owned. The Exchange also considered various

strategic options to bolster its long-term viability. For instance, Archipelago Holdings,

LLC offered $50 million to acquire the Exchange outright—an offer that was rejected.

Instead, the Exchange pursued six separate transactions with so-called "Strategic

Investors" between June 2005 and August 2005.[1] As a result of these transactions, the

Strategic Investors obtained shares that totaled 45% of the outstanding common stock in

the Exchange. Each Strategic Investor also received a warrant that would increase its

ownership stake in the Exchange if the latter met certain performance goals. The

Strategic Investors each met these benchmarks and thus increased their overall ownership

in the Exchange to 89.4%. In August 2005, the Exchange also announced a tender offer

---

[1] The Strategic Investors are six large financial institutions: Citadel Derivatives Group, Citigroup Financial Products, Credit Suisse First Boston, Merrill Lynch, Morgan Stanley, and UBS Securities.

to purchase common stock at $90,000 per 100-share block. None of the appellants sold any of their shares under the tender offer.

In the end, the seat owners were left with approximately 10% of the Exchange's common stock and a smaller amount of the Exchange's equity per share than they had prior to demutualization. In addition, the seat-owner appellants allege that they had "less than they would have had if the more advantageous deals had been accepted by the Board." Appellants' Br. 8-9.

## II. PROCEDURAL HISTORY

This is the second class action brought by stockholders of the Exchange. The two class actions were filed eight days apart—one in Delaware state court and one in federal court. Both challenges involve a similar set of underlying facts, similar defendants, and similar proposed remedies. The state court action settled, and the federal action is before us on appeal. Since the enforceability of the state court settlement turns on the relationship between these two suits, we outline each in turn.

### A. The State Court Action

The first class action was filed in the Delaware Court of Chancery in June 2006 by a different named plaintiff, who was represented by different counsel than is now before us. That plaintiff asserted state law fiduciary claims against the Exchange, its Board, and the Strategic Investors. These claims were based on alleged breaches of fiduciary duties by the Board members in approving the transactions with the Strategic Investors, as well

6

as allegations that the Strategic Investors induced the Board's alleged breaches. The plaintiffs sought rescission of the underlying transactions (or, alternatively damages). In addition, after the Strategic Investors exercised their performance-based warrants, the plaintiffs added a claim based on a violation of the Exchange's Certificate of Incorporation.

In March 2007, the Delaware Court of Chancery certified a settlement class of "all Class A common stockholders of the [Exchange] on April 20, 2005, and their transferees or successors in interest." In June 2007 (and on the eve of trial), the parties settled. The parties and the Vice Chancellor outlined the settlement in a Memorandum of Understanding. The specific terms of the settlement were negotiated over the next two months.

Per the settlement, the defendants agreed to the following: 1) the Strategic Investors agreed to return 14% of their shares; 2) the CEO of the Exchange agreed to cancel 14% of his restricted stock; 3) the Exchange agreed to pay $17.1 million into a settlement fund; and 4) the plaintiff class obtained protections against future stock dilution. As part of the negotiations, the Exchange agreed to provide an additional $3.1 million to sweeten the deal and to secure "a release to the broadest extent possible under law."

In exchange, the plaintiffs agreed to a release that covered all claims arising out of or relating to

7

the subject matter of [the state court] [a]ction, and including without limitation any claims (whether or not asserted) in any way related to: (i) Demutualization; (ii) the Exchange's decision to reject a business combination with Archipelago; (iii) the Exchange's consideration of any merger, acquisition, joint venture, business combination, initial public offering, or other strategic initiatives or transactions involving the Exchange as an alternative to a business combination with Archipelago or the Strategic Investments; (iv) the Tender Offer; (v) the value or valuations of the Exchange done in connection with (iii); (vi) any question of Board or management compensation and Board reorganization prior to December 31, 2006; and/or (vii) the Strategic Investments (including expressly any alleged violations of Article IV of the Exchange's Certification of Incorporation).

S.A. 75-76. The proposed settlement was subject to a bifurcated approval process whereby the Chancery Court considered the fairness of the settlement before analyzing the proposed allocation plan.

After receiving notice of the proposed settlement, several class members filed objections. One group of objectors included the appellants in our case (represented by the same counsel now before us).[2] These objectors offered several challenges to the settlement, including that: 1) the Chancery Court lacked the power to release the federal claims at issue in the present action; 2) the release itself extended to claims that were not at issue in the state court action; 3) the settlement inadequately compensated the class

---

[2] As appellants' counsel clarified after oral argument, he appeared as counsel "before the Chancery Court for both the fairness hearing . . . and the allocation hearing . . . , as well as before the Delaware Supreme Court for the first panel hearing and then the en banc hearing." Supplemental Corrective Statement, at 2. Furthermore, "[a]ll four of the appellants in the case at bar" were represented by appellants' counsel at the fairness and allocation hearings. *Id*. at 2-3.

8

members for their federal claims; 4) the settlement failed to provide adequate notice to absent class members; and 5) class counsel and the class representatives inadequately represented absent class members.[3]

Following a round of briefing and a fairness hearing, the Chancery Court approved the settlement. It concluded that it was "ineluctably clear on the record" that the settlement was fair because it "achieve[d] a significant benefit for the class." S.A. 204, 207. With respect to the release, the Court ruled that it was "broad, but still consistent with [related state and federal precedent]," because the released claims "arise out of *the common nucleus of operative facts* asserted in [the state court] complaint." S.A. 210 (emphasis added). The Court specifically found that the operative facts of the state court action "indisputabl[y]. . . included the circumstances under which the demutualization occurred" and "the process by which the [B]oard rejected the [Archipelago] offer," as well as "the [S]trategic [I]nvestor transactions." S.A. 210-11. Moreover, the settlement was "fair and reasonable, and in the best interests of the class." S.A. 209.[4] In reaching this conclusion, the Court made specific findings, "[b]ased on the record . . . , [that] each of the provisions of . . . Rule 23 ha[d] been satisfied." S.A. 213. The Court then certified a non-opt-out class.

---

[3] These objections track many of the arguments that the appellants make before us.

[4] Some objectors, including one of the appellants in the current action before us (Tim Lobach), appealed the Chancery Court's decision to the Delaware Supreme Court. It affirmed.

After receiving notice of class counsel's proposed allocation plan, class members (including the appellants here) again filed objections. In particular, they argued that the proposed plan insufficiently compensated them for their released claims. After related briefing and an allocation hearing, the Chancery Court approved the plan. It found that there was "more than adequate support" for class counsel's determination that the demutualization claims (at issue in our case) were not valuable. S.A. 300. In particular, the Court noted that "it has been demonstrated clearly in other actions that the demutualization claims have little or no chance of succeeding and, thus, have limited, if any, value." S.A. 300. It added that the objections were "completely without merit[,] [as] [e]very court, both federal and state, that ha[d] considered the[se] claims ha[d] dismissed them." S.A. 304. It observed that the plaintiffs' objections regarding the value of the released claims were "essentially an attack on the terms of the settlement and on the scope of the release therein, which ha[d] already been approved by [the Chancery Court] and by the Delaware Supreme Court." S.A. 305. Finally, the Court rejected the plaintiffs' argument that class counsel and class representatives had a conflict of interest with absent class members, concluding that these counsel and representatives were "in the best position to objectively and fairly propose a plan of allocation[,] . . . ha[d] no conflicts of interest . . . , and ha[d] provided satisfactory responses to all objections . . . , both [those] with merit and others." S.A. 306. The Delaware Supreme Court later approved the allocation plan.

10

**B.      The Federal Action**

Shortly after the state court action was filed, the parties in the current case filed an

action in the United States District Court for the Eastern District of Pennsylvania against

the Exchange's Board, two Exchange officers, and the Strategic Investors for their

involvement in the demutualization of the Exchange.[5]  Their core claim was that

"demutualization and the investment by the Strategic Investors decreased the value of

their ownership interests in the [Exchange], and that [the appellees] fraudulently

engineered this result for their own enrichment."  *McGowan Investors LP v. Frucher*, 481

F. Supp. 2d 405, 407-08 (E.D. Pa. 2007).  In particular, the initial complaint included an

SEC Rule 10b-5 claim for securities fraud against the Exchange defendants and a

"fraudulent transfer" claim against the Strategic Investors.  As a remedy, the complaint

sought rescission of the underlying transactions (or, alternatively damages).  The

appellants also filed a motion for a temporary restraining order and a preliminary

injunction prohibiting the Strategic Investors from exercising their performance-based

warrants, which the District Court denied.

The appellants then filed an amended complaint, which included six counts: two

counts against the Exchange defendants (for securities fraud under Rule 10b-5 and breach

of fiduciary duty) and four counts against the Strategic Investors (for securities fraud

_____

[5] Though the legal claims pursued in each action were different, the factual allegations
included in each complaint were quite similar.

11

under Rule 10b-5, "commercial bribery," "fraudulent transfer," and aiding and abetting the breach of a fiduciary duty). In addition to seeking rescission of the underlying transactions, the appellants also sought rescission of the stock purchases made during the tender offer and a reversal of the demutualization itself (again, the alternative was money damages).[6]

In March 2007—and prior to the state court settlement—the District Court granted the appellees' motion to dismiss with prejudice for failure to state a claim. In dismissing this action, the Court noted the shifting theories offered by appellants' counsel throughout the proceedings. It explained that "[t]he Amended Complaint gave every indication that the [appellants] were proceeding solely under Rule 10b-5 for damages." *McGowan*, 481 F. Supp. 2d at 409. Nevertheless, the appellants largely abandoned their Rule 10b-5 claims in responding to the defendants' motion to dismiss, arguing instead "that they were actually proceeding under section 29(b) [of the Securities Exchange Act, 15 U.S.C. § 78cc(b),] based on an underlying 10b-5 violation." *Id.* at 408. Even after this shift, the Court noted that "[a]t oral argument . . . [appellants] seemed to change course again and assert both a 29(b) claim and an independent 10b-5 claim." *Id.* at 410.

These shifts led the District Court to conclude that the appellants' "vacillations

---

[6] The District Court described the appellants' "central allegation" as follows: "that demutualization was a plot against them to strip them of their equity via dilution, and that the [Exchange] defendants engineered the equity deal with the Strategic Investors to accomplish this goal." *McGowan*, 481 F. Supp. 2d. at 413.

g[a]ve [it] reason enough to dismiss this case with prejudice without reaching the merits of either claim at all." *Id.* Nonetheless, it analyzed the merits of Plaintiffs' Rule 10b-5 and Section 29(b) claims, dismissing both with prejudice because the plaintiffs "had ample opportunity to litigate their securities fraud claims and provide[d] no reason to believe that they could fruitfully add anything to their case." *Id.* at 419.

The plaintiffs filed a timely notice of appeal. Under our August 2008 Order, the appeal at this stage focuses on a single issue: whether the state court release bars the claims asserted in this federal action. For the reasons that follow, we conclude that it does.

## III.    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

We exercise plenary review of the applicability of the state court release to this federal action. "Basic contract principles apply to the review of settlement agreements," and "[w]e exercise plenary review over application of the construction of an agreement to the facts of a case." *Flemming ex rel. Estate of Flemming v. Air Sunshine, Inc.*, 311 F.3d 282, 289 (3d Cir. 2002). This is true even in the current case (where the release was not before the District Court) since we may affirm the decision below on any ground(s) supported by the record. *See Johnson v. Orr*, 776 F.2d 75, 83 n.7 (3d Cir. 1985). Furthermore, even as the release was approved after the District Court dismissed the

13

appellants' claims on the merits, the record for this appeal "is subject to [our] right . . . to take judicial notice of new developments not considered by [that] [C]ourt." *In re Am. Biomaterials Corp.*, 954 F.2d 919, 922 (3d Cir. 1992) (internal quotation marks omitted).

## IV.   ANALYSIS

Article IV of the United States Constitution reads as follows: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State.  And the Congress may by general Laws prescribe the Manner in which such Acts, Records, and Proceedings shall be proved, and the Effect thereof." With this constitutional provision in mind, the Full Faith and Credit Act mandates that judicial proceedings "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken."  28 U.S.C. § 1738.  Relevant to our case, "a judgment entered in a class action . . . is presumptively entitled to full faith and credit under the express terms of the Act."  *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 374 (1996).  Hence, "[i]t is now settled that a judgment pursuant to a class settlement can bar later claims based on the allegations underlying the claims in the settled action."  *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366 (3d Cir. 2001).  This is true even when a settlement in state court extends to claims over which the federal courts have exclusive jurisdiction.  *See Matsushita*, 516 U.S. at 375.

Under the Full Faith and Credit Act, we are required to "inquire into the scope of

14

state preclusion law" to determine the applicability of a release. *Grimes v. Vitalink Comm'ns Corp.*, 17 F.3d 1553, 1562 (3d Cir. 1994). The U.S. Supreme Court outlined the proper approach in *Matsushita*. "When faced with a state court judgment relating to an exclusively federal claim, a federal court must first look to the law of the rendering State to ascertain the effect of the judgment." *Matsushita*, 516 U.S. at 375. If state preclusion law bars the claim, "the federal court must next decide whether, as an exception to § 1738, it should refuse to give [the judgment] preclusive effect." *Id.* (internal quotation marks omitted).

With that approach in mind, "Delaware has traditionally treated the impact of settlement judgements on subsequent litigation in state court as a question of claim preclusion." *Id.* at 376. Indeed, Delaware "follows the usual rule that a judgment in one case constitutes a final determination concerning questions of fact litigated by the parties." *Grimes*, 17 F.3d at 1563. "To bar future claims, a release must (1) apply to the plaintiff; (2) circumscribe the asserted claims; and (3) be legally enforceable." *McGowan Investors LP v. Keefe Bruyette & Woods, Inc.*, 540 F. Supp. 2d 571, 576 (E.D. Pa. 2008). "[T]he limiting principle is that a settlement can release claims that were not specifically asserted in the settled action, but only if those claims are 'based on the same identical factual predicate or the same set of operative facts as the underlying action.'" *In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1146 (Del. 2008) (en banc) (quoting *UniSuper, Ltd. v. News Corp.*, 898 A.2d 344, 347 (Del. Ch. 2006)). In other words, "a release is overly

15

broad if it releases claims based on a common set of tangential facts, as opposed to operative or core facts." *UniSuper*, 898 A.2d at 347.

Turning now to the state court proceedings in our action, the objectors challenged the release language "only insofar as it would release claims relating to 'Demutualization.'" *Phila. Stock Exch.*, 945 A.2d at 1147. The Chancery Court rejected this challenge, concluding that it was "indisputable" that the demutualization claims "arise out of the common nucleus of operative facts asserted in the [state court] complaint." S.A. 210. The Chancellor added that they were part of the "entire mix of claims that were before this Court in one fashion, form or another, and that I heard countless arguments about in discovery disputes and in motion practice, and I am confident now are properly encapsulated under Delaware law by the scope of the release in this settlement." A.A. 211.

On appeal, the Delaware Supreme Court agreed. It explained that "the Demutualization was both the subject of claims of wrongdoing in the complaint and of intensive pretrial discovery . . . . In addition, the Demutualization was the subject of document discovery requests, interrogatories, and deposition questions of [Exchange] witnesses." *Phila. Stock Exch.*, 945 A.2d at 1147-48. Given this, the Court concluded that "the Demutualization was not a transaction that was 'unrelated' or 'tangential' to or 'remote' from the conduct that form[ed] the basis for the specific claims for relief asserted" in the state court action. *Id.* at 1148. Instead, it was at their core.

16

In the end, it is undisputed that the appellants before us were members of the state court class and that the Chancery Court (affirmed by the Delaware Supreme Court) concluded that "all members of the Class are bound" by the judgment. S.A. 213. Further, the broad release negotiated by the parties in state court, by its very terms, covers the claims that the appellants have brought in their federal action. Indeed, the settlement released all claims arising out of or relating to "the subject matter [of the state court action], including without limitation any claims (whether or not asserted) in any way related to: (i) Demutualization." S.A. 75-76. Finally, the release itself is consistent with broad release language that we have upheld in previous cases. *See, e.g.*, *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d at 367; *Grimes*, 17 F.3d at 1563. As a result, the only remaining question is whether any exception to the Full Faith and Credit Act applies to the federal action. Without such an exception, the appellants are precluded by their release from bringing that action. For the reasons that follow, we discern none.

## A. Due Process and Personal Jurisdiction

We turn first to the appellants' due process challenges. In relevant part, they argue that "the manner in which the Delaware courts proceeded resulted in such a denial of due process . . . that full faith and credit must be denied to the Delaware judgment." Appellants' Br. 36. Their specific arguments include scattered challenges to: 1) the state court's jurisdiction to release the federal claims brought in the current suit; 2) the state court's application of Delaware Chancery Rule 23 in certifying the non-opt-out class; 3)

17

the ability of class counsel and the class representative to represent adequately the interests of the appellants in state court; and 4) the adequacy of class notice provided to absent class members. We reject each of these challenges.

When presented with a settlement in the class action context, "the court has more than a ministerial duty to enter the negotiated settlement and release as a judgment." *Grimes*, 17 F.3d at 1557. Indeed, it "has an elevated duty to ensure that the settlement is fair and adequate to all the plaintiff class members, not just the named representatives who negotiated its substantive terms." *Id.* "This duty is particularly acute when . . . the class members have been denied an opportunity to opt out of the putative class," as was the case here. *Id.* at 1557-58.

Even if class members were "not provided with an opportunity to opt out, the state court ha[s] the requisite power to bind absent class members as long as they had minimum contacts with the forum and they were not otherwise denied due process." *Id.* at 1558. To satisfy due process, "the Delaware state court need only have provided 'notice plus an opportunity to be heard and participate in the litigation.'" *Id.* at 1560 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985)). Notice satisfies due process when it is "sent by mail to each class member," "contain[s] a full disclosure of the proposed settlement and its ramifications," and "notifie[s] all class members that a hearing to determine the fairness and reasonableness of the settlement ha[s] been scheduled." *Id.* at 1560. "Once a court has decided that the due process protections did

18

occur for a particular class member or group of class members, the issue may not be relitigated." *In re Diet Drugs*, 431 F.3d 141, 146 (3d Cir. 2005). In other words, "[n]o collateral review is available when class members have had a full and fair hearing and have generally had their procedural rights protected during the approval of the Settlement Agreement." *Id.* This was the case here.

We are guided in our analysis by our previous decision in *Grimes*. There, an action was brought in federal court relating to a merger agreement between two Delaware corporations. The federal action involved claims for violations of sections 10(b) and 14(e) of the Exchange Act. Parallel actions were brought in state court, claiming state law violations. Before the federal action was resolved, the parties settled in state court. This settlement included a broad release of "all claims arising from the merger transaction." *Grimes*, 17 F.3d at 1563. Grimes and other objectors opposed the settlement, but the Chancery Court ultimately approved it. Grimes later appealed to the Delaware Supreme Court (which affirmed) and filed a petition for a writ of *certiorari* (which the U.S. Supreme Court denied).

In *Grimes*, the overarching question before us was "whether a state court, which does not have subject matter jurisdiction to hear exclusive federal claims, may nevertheless approve a settlement and release of those claims by the parties." *Id.* at 1557. We held that it could, explaining that "the Delaware court did not purport to exercise any inherent power to release causes of action that it had no jurisdiction to entertain." *Id.*

19

Instead, it "only acted to enter a settlement agreement that was initiated, negotiated, and adopted by the parties to a lawsuit that was properly before it." *Id.* In such a context, "the settlement and release of claims [wa]s a contract that not only [wa]s agreed upon by the parties, but also [wa]s stamped with the imprimatur of the court with jurisdiction over the parties and the subject matter of the lawsuit." *Id.*

As to due process, we noted that "objecting class member must be given an opportunity to address the court as to the reasons the proposed settlement is unfair and inadequate." *Id.* at 1558. "[T]he federal plaintiffs . . . were provided with such an opportunity in the state court litigation." *Id.* As such, we concluded that the class members "had been granted all the process that was due . . . . [They] were provided an opportunity to be heard, actually litigated, and lost on the issue of whether they were deprived due process in the state court proceeding." *Id.*

The same may be said here, as the appellants have received similar process, as well as adequate notice.[7] Indeed, they participated extensively in the state court litigation

---

[7] The notice provided in the state court action satisfied any reasonable due process concerns. The Chancery Court concluded as much, noting that the settlement notice was "more than adequate." S.A. 210. The Delaware Supreme Court also added that the settlement notice "disclose[d] all the information needed for class members to make an informed decision regarding the fairness of the settlement." *Phila. Stock Exch.*, 945 A.2d at 1135 n.13. We agree. At the very least, it provided the appellants (as well as other objectors) with sufficient notice to challenge the fairness of the settlement, as well as the proposed allocation plan, in state court.

Finally, we conclude that notice in the state court action did not need to comply with requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, for settlements in federal securities actions. Although perhaps reasonable as a

20

pertaining to the fairness of the settlement and allocation plan.[8] This is all the process that was due to them. On appeal, the appellants have largely recycled many of the same due process arguments that they had raised already in state court (and that the state courts had rejected). Under *Grimes*, the appellants are not permitted to "relitigate in federal court the . . . fairness of the settlement that [was] conclusively determined in the Delaware proceeding." *Id.* at 1562.

In addition, as in *Grimes*, the appellants had sufficient minimum contacts with the state forum to support the state court's jurisdiction over them (and their related claims). In short, the appellants owned Delaware stock and "purposefully availed [themselves] of the privilege of having the Delaware Court of Chancery finally, and in a single lawsuit, determine the adequacy of the settlement agreement." *Id.* at 1559. The appellants objected to the settlement and the allocation plan, appeared in the Chancery Court for both hearings, and (in the case of one of the appellants) appealed the fairness of the settlement all the way to the Delaware Supreme Court.

In the end, the appellants' challenges to the state court release on due process and

---

matter of policy, the appellants offered little legal support for their argument to the contrary. Indeed, the objectors even conceded in Chancery Court that there was "no mandated obligation" to follow these statutory requirements. S.A. 199. Instead, the objectors requested that the Chancery Court adopt the PSLRA's requirements as "a *policy* . . . in Delaware." S.A. 199 (emphasis added).

[8] The Chancery Court went out of its way to note that "[t]his case has been remarkably contentious in every phase, from the litigation stage right down to the settlement phase and, not to be outdone, now at the allocation phase." S.A. 288.

jurisdictional grounds fail.

### B. The Full Faith and Credit Act

Finally, the appellants argue that the PSLRA and Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb, impliedly repealed the Full Faith and Credit Act. This argument also fails.

In *Matsushita*, the Supreme Court acknowledged that it has "seldom, if ever, held that a federal statute impliedly repealed [the Full Faith and Credit Act]." 516 U.S. at 380. The Court explained that this was "due to the relatively stringent standard for such findings, namely, that there be 'irreconcilable conflict' between the two federal statutes." *Id.* The Court held that the exclusive federal jurisdiction provision of the Exchange Act did not impliedly repeal the Full Faith and Credit Act.

The appellants offer little support for their arguments under the PSLRA and SLUSA—whether in the form of statutory text, legislative history, or doctrine.[9] Instead, they offer vague arguments from statutory purpose, noting that the PSLRA and SLUSA were enacted to vindicate a larger policy preference of granting control of federal securities actions to the class member with the largest financial interest. This is not enough to meet the heavy burden of establishing that these statutes impliedly repealed the Full Faith and Credit Act.

---

[9] Indeed, the appellees argue that the appellants offer so little support for this argument that they have effectively waived it.

\* \* \* \* \*

For these reasons, we affirm the judgment of the District Court.[10]

---

[10] We also deny the appellants' motion for leave to file a supplemental brief. We agree with the appellees that additional briefing is unnecessary, as the recent Supreme Court decisions raised by the appellants in their motion do not alter the disposition of this appeal.