# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MICHAEL BLUE, CHRISTIAN GROH, and BRENDAN KENNEDY )
)
)
Plaintiffs/Counterclaim Defendants, )
)
)
v. )
)
TILRAY BRANDS, INC. and PRIVATEER EVOLUTION, LLC, )
)
)
Defendants/Counterclaim Plaintiffs. )

C.A. No. 2023-0821-KSJM

## MEMORANDUM OPINION

Date Submitted: October 22, 2024
Date Decided: February 17, 2025

Marcus E. Montejo, John G. Day, Seth T. Ford, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; *Counsel for Plaintiffs and Counterclaim Defendants Michael Blue, Christian Groh, and Brendan Kennedy.*

Michael A. Barlow, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Rachel E. Epstein, Stacylyn Doore, Evan Hess, Mario Gazzola, QUINN EMANUEL URQUHART, & SULLIVAN, LLP, New York, New York; *Counsel for Defendants and Counterclaim Plaintiffs Tilray Brands, Inc. and Privateer Evolution, LLC.*

**McCORMICK, C.**

The parties dispute whether a court-approved settlement of a prior stockholder suit released the defendants' claims against the plaintiffs under a guarantee. The plaintiffs request a declaratory judgment that the claims were released. The defendants counterclaim for breach of the guarantee. This decision enters judgment on the pleadings for the plaintiffs on their claim for declaratory judgment and dismisses the defendants' counterclaim.

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Complaint, the Answer and Verified Counterclaim, and the documents they incorporate by reference.[1]

Plaintiffs Michael Blue, Christian Groh, and Brendan Kennedy (collectively, "Plaintiffs" or the "Founders") founded Privateer Holdings, Inc. ("Privateer"), an investment firm in the cannabis industry.

In July 2016, Docklight Brands, Inc., a Privateer portfolio company, entered into an agreement with Marley Green, LLC to license intellectual property owned by the Estate of Bob Marley (the "License Agreement").[2] Docklight, in turn, licensed the Marley Green intellectual property to Tilray Brands, Inc. ("Tilray"), which was also a Privateer portfolio company at the time, and to Tilray's wholly owned subsidiary, High Park Holdings, Ltd. ("High Park"). In exchange for rights over Marley-branded cannabis products, Tilray and High Park agreed to make royalty payments to Docklight sufficient to fund Docklight's payment obligations to Marley Green.

---

[1] *See* C.A. 2023-0821-KSJM, Docket ("Dkt.") 1 ("Compl."), 9 ("Answer" or "Counterclaim").

[2] Answer ¶ 16.

Privateer guaranteed Docklight's obligations under the License Agreement (the "Original Guarantee").[3] Under the Original Guarantee, Privateer agreed to "absolutely, unconditionally and irrevocably guarantee to Marley [Green] the full performance by [Docklight] of all of [Docklight's] obligations under the [License Agreement]."[4]

Tilray went public through an initial public offering (the "IPO") on July 19, 2018. After the IPO, Plaintiffs held a controlling interest in Tilray through Privateer. In 2019, Privateer and Tilray effected a reorganization (the "Reorganization") to give Plaintiffs liquidity and eliminate the overhang of Privateer's control stake, while avoiding the potential tax consequences associated with dissolving Privateer.

To effectuate the Reorganization, Plaintiffs, Privateer, and Tilray entered into several agreements, including: an Agreement and Plan of Merger and Reorganization (the "Merger Agreement") and a guarantee agreement (the "Founders' Guarantee").[5] The agreements were executed together on September 9, 2019. Under the Merger Agreement, Privateer would merge with and into Privateer Evolution, LLC, a wholly owned subsidiary of Tilray. Privateer's stockholders, including Plaintiffs, would then be issued Tilray stock.[6] Through the Founders' Guarantee, Plaintiffs assumed Privateer's obligations under the Original Guarantee.[7]

---

[3] *Id.* ¶ 18.

[4] *Id.* ¶ 27.

[5] *Id.* ¶¶ 13, 19; Dkt. 26, Ex. E (Docklight Letter Agr.).

[6] Dkt. 26, Ex. C ("Merger Agr.") § 1.

[7] Dkt. 26, Ex. D (Founders' Guarantee) at 1.

After Tilray announced the Reorganization, two sets of Tilray stockholders filed claims for breach of fiduciary duty in this court challenging the Reorganization. The court consolidated the actions on July 17, 2020 (the "Reorganization Litigation"), and the stockholder plaintiffs filed a consolidated complaint on July 17, 2020 (the "Reorganization Complaint").[8]

After Plaintiffs commenced the Reorganization Litigation, Tilray combined with Aphria, Inc., and Aphria directors comprised a majority of Tilray's board of directors (the "Board").[9]

The court denied a motion to dismiss the Reorganization Complaint on June 1, 2021.[10] In response, the Board formed a special litigation committee (the "SLC") to determine whether to pursue the claims in the Reorganization Complaint. The court stayed the Reorganization Litigation to allow the SLC to conduct its investigation. The SLC investigated the claims for over a year, interviewing twenty witnesses, reviewing over 100,000 documents, and meeting twenty-two times. A team of lawyers from a well-respected firm advised the SLC.

On May 27, 2022, the SLC reported to the court that it had concluded its investigation and determined that it was in Tilray's best interest to mediate the

---

[8] Compl. ¶ 24 (citing *In re Tilray, Inc. Reorganization Litig.*, C.A. 2020-0137-KSJM Dkt. 73 (Reorganization Complaint)).

[9] Dkt. 26., Ex. N (SLC Br.) at 8–9.

[10] *In re Tilray, Inc. Reorganization Litig.*, 2021 WL 2199123 (Del. Ch. Jun. 1, 2021).

claims. The parties agreed to mediate before a prominent Delaware attorney in private practice.[11]

After months of mediation, the Reorganization Litigation parties reached a settlement agreement.[12] On December 20, 2022, the parties executed the Stipulation of Compromise, Settlement and Release (the "Settlement Stipulation"), setting out the terms of a settlement that was approved by the court on March 8, 2023 (the "Settlement").

Under the Settlement Stipulation, Plaintiffs agreed to pay $39.9 million to Tilray in exchange for a "Release" of "Released Claims."[13] In relevant part, the Settlement Stipulation defined Released Claims as claims that are related to "the Reorganization and the Merger Agreement" and "the allegations and events described in the [Reorganization] Complaint . . . ."[14]

Meanwhile, on May 29, 2020, Docklight sued Tilray and High Park for breach of the License Agreement.[15] Docklight's suit was pending during the SLC's investigation.[16] On July 12, 2023, Marley Green demanded that Privateer Evolution perform under the Original Guarantee.[17] On July 17, 2023, Tilray demanded that

---

[11] Compl. ¶ 32.

[12] *Id.* ¶ 33.

[13] *Id.* ¶ 34; Counterclaim ¶ 56.

[14] Dkt. 26, Ex. H (Settlement Stip.) § 1.9.

[15] Compl. ¶ 46.

[16] *Id.* ¶¶ 46–47.

[17] *Id.* ¶ 50; Dkt. 26, Ex. C.

Marley Green perform under the Founders' Guarantee (the "Demand"). The Founders refused the Demand on the ground that the Release discharged their obligations under the Founders' Guarantee.

Plaintiffs filed this action on August 11, 2023, seeking a declaration that any of the obligations they once had under the Founders' Guarantee were released under the Settlement.[18] Tilray and Privateer Evolution (together, "Defendants"), filed their Answer and a Counterclaim for breach of the Founders' Guarantee.[19] Plaintiffs moved for judgment on the pleadings on their claim and to dismiss the Counterclaim.[20] The parties completed briefing both motions on July 29, 2024,[21] and the court heard oral argument on October 22, 2024.[22]

## II. LEGAL ANALYSIS

Plaintiffs have moved for judgment on the pleadings as to their claims under Court of Chancery Rule 12(c). A motion for judgment on the pleadings may be granted "when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[23] The proper interpretation of a contract, while analytically a question of fact, is treated as a question of law by Delaware courts.[24] A motion for

---

[18] Dkt. 1.

[19] Dkt. 9.

[20] Dkts. 11, 25.

[21] Dkts. 28, 34.

[22] Dkt. 40.

[23] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[24] *Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at \*10 (Del. Ch. Dec. 19, 2017) (quoting *Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del. 1991)).

5

judgment on the pleadings "is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[25] Thus, the court may "consider the unambiguous terms of exhibits attached to the pleadings, including those incorporated by reference." Under Rule 12(c), "a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party."[26]

Plaintiffs have also moved to dismiss the Counterclaim under Court of Chancery Rule 12(b)(6). "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[27] On a motion to dismiss, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[28] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[29]

---

[25] *Id.* (citing *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

[26] *Desert Equities*, 624 A.2d at 1205.

[27] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[28] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[29] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

Plaintiffs argue that the Release unambiguously covers the Founders' Guarantee because, at a minimum, it is "related to" both "the Reorganization and the Merger Agreement."[30] Defendants deny that the Release covers the Founders' Guarantee, argue that the Release is ambiguous, and say that extrinsic evidence favors their position. Defendants further argue that, even if the plain language of the Release unambiguously covers the Founders' Guarantee, it may not extend to the Demand as a matter of law because Delaware law prohibits overbroad releases in settlements of representative litigation.

## A. The Release Unambiguously Covers The Founders' Guarantee.

The Settlement Stipulation defines "Released Claims" as follows:

> any and all manner of claims, demands. . . that are, have been, could have been, could now be, or in the future could, can, or might be asserted, in the Action or in any other court, tribunal, or proceeding . . . which, now or hereafter, are based upon, arise out of, or relate to any of the actions or inactions, transactions, occurrences, statements, representations, misrepresentations, omissions, allegations, facts, practices, events, claims, or any other matters related to (i) the Reorganization and the Merger Agreement; (ii) the allegations and events described in the [Reorganization] Complaint . . . .[31]

Plaintiffs argue that the Release unambiguously covers the Founders' Guarantee because, at a minimum, it is "related to" both "the Reorganization and the Merger Agreement." Plaintiffs also argue that the Founders' Guarantee is an "event[] described in the Reorganization Complaint." Because their first argument prevails,

---

[30] Settlement Stip. § 1.9.

[31] *Id.*

7

the court does not reach the second argument. Also, because the above language is unambiguous, the court does not look to extrinsic evidence.

Much of Plaintiffs' argument turns on the meaning of "relate to." Related means "connected in some way" or "having a relationship with something else."[32] Delaware courts recognize "relating to" as a paradigmatically broad term,"[33] and have described "relating to" as a far-reaching phrase that permits "relatively attenuated connections"[34] and that lawyers often use "when they wish to capture the broadest possible universe."[35]

The Founders' Guarantee is connected in some way to the Reorganization. The Reorganization restructured the legal relationship between Plaintiffs, Privateer, and Tilray. Before the Reorganization, Privateer was obligated under the Original Guarantee. After the Reorganization, Privateer was a subsidiary of Tilray. Tilray did not agree to assume Privateer's liability under the Original Guarantee, so Plaintiffs did so through the Founders' Guarantee.[36] The Reorganization and the Founders' Guarantee are therefore related.

---

[32] Related, Black's Law Dictionary (12th ed. 2024).

[33] *City of Newark v. Donald M. Durkin Contracting, Inc.*, 305 A.3d 674, 680 (Del. 2023) (quoting *Lillis v. AT &T Corp.,* 904 A.2d 325, 331 (Del. Ch. 2006)); *see also Pacira BioScience, Inc. v. Fortis Advisors. LLC,* 2025 WL 251472, at *14 (Del. Ch. Jan. 21, 2025) (concluding the phrase "related to use" did not require actual use).

[34] *Texas Pac. Land Corp. v. Horizon Kinetics LLC,* 306 A.3d 530, 554 (Del. Ch. 2023), *aff'd* 314 A.3d 685 (Del. 2024).

[35] *Deluca v. KKAT Mgmt., LLC,* 2006 WL 224058, at * 10 (Del. Ch. Jan. 23, 2006).

[36] Dkt. 40 (Oral Arg. Tr.) at 32:6–15.

Plaintiffs' position that the matters were related finds further support in the plain language of both the Merger Agreement and the Founders' Guarantee.

- Section 12.3 of the Merger Agreement contains its integration clause, which pertains to "Transaction Documents" defined to include agreements "contemplated" in the Merger Agreement.[37]

- Section 7.6(h) of the Merger Agreement "contemplates" the Founders' Guarantee by conditioning closing on Tilray's receipt of the Founders' Guarantee.[38]

- Sections 11.2(i) and 11.7 of the Merger Agreement governing indemnification provides that any loss Defendants incur due to the Original Guarantee is handled through the escrowed Tilray stock that Plaintiffs would otherwise receive.[39]

- Section 2.02 of the Founders' Guarantee provides that the guarantee only becomes enforceable as of the Escrow Release date provided in the Merger Agreement.[40]

- The recitals of the Founders' Guarantee state that the Founders' Guarantee was made "in connection with certain agreement and plan of merger and reorganization . . . made and entered into as of September 9, 2019."[41]

- The Founders' Guarantee also describes itself as "a material inducement for [Tilray] to enter into the Merger Agreement" and "a condition to closing the Merger . . . so that [Tilray] assume[s] no financial or other risk in connection with the Guaranteed Obligations."[42]

Summing up these terms, the Founders' Guarantee was: a condition to the Merger Agreement; contemplated by and thus integrated into the Merger Agreement;

---

[37] *Id.* § 12.3; *id.* at A-15.

[38] Merger Agr. § 7.6(h).

[39] *Id.* §§ 11.2(i), 11.7.

[40] Founders' Guarantee § 2.02.

[41] *Id.* at 1.

[42] *Id.*

9

a consideration in the indemnification provisions of the Merger Agreement; and a material inducement to the Merger Agreement. Given these plain terms, it is very difficult to deny that the Founders' Guarantee is related to both the Merger Agreement and the Reorganization.

In response, Defendants first argue that the Founders' Guarantee is not part of the terms "Merger Agreement" or "Reorganization" as defined in the Settlement Stipulation.[43] This argument is beside the point because the Founders' Guarantee need only be "related to" the Merger Agreement or Reorganization to fall within the scope of the Release. It is related to both, as discussed above.

Defendants next argue, based on *E.I. DuPont de Nemours & Co. v. Florida Evergreen Foliage*, that the Release cannot apply to the Founders' Guarantee because the guarantee is not mentioned in the recitals of the Settlement Stipulation. In *Evergreen*, the Delaware Supreme Court certified the legal question of whether a party who signed a release of a tort claim can sue a released party for fraudulent inducement. In resolving the question, the Court first held that the plaintiff had adequately alleged fraudulent inducement and that the language of the release at issue was ambiguous. The Court then determined the scope of the release was limited to the matters referenced in the recitals, articulating the broad legal principle as follows: "[W]ords of general application used in a release 'which generally follow a specific recital of the subject matter concerned are not to be given their broadest

---

[43] Dkt. 28 ("Defs.' Answering Br.") at 19–23.

10

significance but will be restricted to the particular matter referred to in the recital.'"[44]

Pulling this quote out of context, Defendants argue that a release may only be construed as broadly as the recitals in the agreement in which it is found. And because the Settlement Stipulation does not mention the Founders' Guarantee, the Release does not encompass it.

But *Evergreen*—where the release language was ambiguous—does not require the court to narrow an *unambiguous* release to the recitals of an agreement. Nor does it necessarily require the court to limit the scope of an *ambiguous* release to the recitals of an agreement outside of the fraud context. The *Evergreen* court made a point of this, noting that although parties entering into a general release must accept some uncertainty around its full scope, "[i]t is quite another thing. . . to conclude that a person is deemed to have released a claim of which he has no knowledge, when the ignorance of such a claim is attributable to fraudulent conduct by the released party."[45] The Release is not ambiguous, and Defendants do not claim fraud.[46]

Defendants also rely on later cases of this court applying the *ejusdem generis* canon of interpretation to narrow the scope of the Release.[47] In *iBio, Inc. v.*

---

[44] 744 A.2d 457, 460 (Del. 1999).

[45] *Florida Evergreen*, 744 A.2d at 462.

[46] Defendants also rely on *iBio, Inc. v. Fraunhofer USA, Inc.*, for the proposition that "general words in a release are limited always to that thing or those things which were specially in the contemplation of the parties at the time when the release was given," which stands for the uncontroversial proposition that a court may look to recitals when interpreting an agreement. 2016 WL 4059257, at *15 n.141 (Del. Ch. July 29, 2016).

[47] Defs.' Answering Br. at 29–32.

11

*Fraunhofer USA, Inc.*, for example, the court limited the scope of a general release based on the specific language of the sections that came before it. Here, because the Release is expressly drafted to apply to matters "related to" the Reorganization and Merger Agreement, this canon does not apply.[48]

At bottom, the Founders' Guarantee is related to the Merger Agreement and the Reorganization and is thus within the scope of the Release.

## B. The Release Is Not Overbroad As Applied To The Demand.

Based on case law narrowly construing the scope of releases in the context of derivative litigation like the Reorganization Litigation, Defendants argue that the Release cannot encompass the Demand.

"A key consideration in the approval of a derivative or class action settlement is to ensure that the interests of the represented parties have not fallen victim—intentionally or inadvertently—to the personal interests of the representative plaintiff and its counsel."[49] For this reason, settlement of derivative claims requires court approval.[50] "The Delaware Supreme Court has made plain that the Court's duty to protect absent stockholders carries particular significance when reviewing a release. While the Court need not second-guess or optimize every element of a settlement, the breadth of the release requires careful inspection."[51]

---

[48] *iBio,* 2016 WL 4059257, at *15.

[49] *AMC,* 299 A.3d at 523.

[50] Ct. Ch. R. 23.1(c).

[51] *AMC,* 299 A.3d at 523.

Defendants argue that Plaintiffs' reading of the Release would render the Release impermissibly broad for three reasons. First, it would release claims based on the Founders' Guarantee, although the operative complaint only referred to the Founders' Guarantee once. Second, it would release claims based on a property interest that is different from the interest at issue in the Reorganization Litigation. Third, it would release claims based on a set of operative facts that involved the Demand, which was sent after the actions that gave rise to the Reorganization Litigation.

### 1. Same Core Facts

In a derivative action, a settlement can release only those claims "based on the 'same identical factual predicate' or the 'same set of operative facts' as the underlying action."[52] Where the release may be interpreted to "encompass any claim that has some relationship—however remote or tangential—to any 'fact,' 'act,' or conduct 'referred to' in the Action," it is impermissibly broad.[53]

Defendants argue that the Founders' Guarantee was only tangentially related to the Reorganization Litigation. They note—correctly—that the Founders' Guarantee was mentioned once in the Reorganization Complaint, and that it was not

---

[52] *Phila. Stock Exch.,* 945 A.2d at 1146 (quoting *UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 347 (Del. Ch. 2006)); *see Ebix,* 2016 WL 208402, at *12 (applying the "identical factual predicate" analysis to a release settling derivative claims).

[53] *Phila. Stock Exch.*, 945 A.2d at 1146 (quoting *UniSuper*, 898 A.2d at 347).

mentioned in the Settlement Stipulation, in any of the submissions seeking the court's approval of the Settlement Stipulation, or at the settlement hearing.[54]

Defendants overstate the significance of these omissions and ignore other pertinent facts. For example, the one reference to the Founders' Guarantee in the Reorganization Complaint noted that the guarantee was "necessary to" the Reorganization.[55] Moreover, as previously discussed, the Founders' Guarantee was a condition to the Merger Agreement, integrated into the Merger Agreement, expressly relevant to the indemnification obligations found in the Merger Agreement, and a material inducement to the Merger Agreement. The relationship between the Founders' Guarantee and the transactions challenged in the Reorganization Litigation meets the core-facts test on which Defendants rely.

*In re Philadelphia Stock Exchange, Inc.* is instructive.[56] That action focused on the "Strategic Investor Transactions," through which a securities exchange (the "Exchange") sold 45% of its equity, as well as warrants, to six strategic investors. A stockholder filed suit against the Exchange's directors and the six investors, seeking rescission of the Strategic Investor Transactions or rescissory damages. After the six investors exercised their warrants, the stockholder amended its complaint to add allegations contending that the six investors' ownership violated an article (Article

---

[54] Defs.' Answering Br. at 23–27.

[55] Reorganization Complaint ¶ 154.

[56] 945 A.2d 1123, 1148 (Del. 2008).

IV) of the Exchange's charter that prohibited a person or group of persons from owning more than 20% of the Exchange's stock.[57]

The parties reached a settlement the next year. The six investors, along with the Exchange's CEO, agreed to return a portion of their stock, make a cash payment (primarily for attorneys' fees), and implement protections against future dilution.[58] Class members objected to the settlement release's inclusion of claims related to "Demutualization"—the term used for the January 2004 conversion of the Exchange from a non-profit corporation to a for-profit corporation, through which the Exchange's charter (including Article IV) was adopted.[59]

The court overruled the objection related to Demutualization, and the Delaware Supreme Court affirmed. In reaching this conclusion, the high court characterized "the relevant issue" as "whether the Demutualization claims arise out of the same set of operative facts as the claims that form the subject of claims for relief."[60] Although there were no claims challenging the Demutualization specifically, the court concluded that claims related to the Demutualization could be released. The court reasoned that the Demutualization enabled the Strategic Investor Transactions (before Demutualization, the Exchange was a non-profit), and the Exchange's charter was adopted in connection with the Demutualization, so "the Demutualization was not a transaction that was 'unrelated' or 'tangential' to or

---

[57] *Phila. Stock Exch.*, 945 A.2d at 1130–31.

[58] *Id.* at 1132.

[59] *Id.* at 1130, 1145–47.

[60] *Id.* at 1148.

'remote' from the conduct that forms the basis for the specific claims for relief asserted here." [61]

The Founders' Guarantee bears far more directly on the claims at issue in the Reorganization Litigation than the Demutualization bore on the claims in *Philadelphia Stock Exchange*. The Demutualization occurred over a year before the Strategic Investor Transactions; the Merger Agreement and the Founders' Guarantee were executed contemporaneously. The Demutualization was not completed in order to enable the Strategic Investor Transactions; the Founders' Guarantee was "a material inducement for the Guaranteed Parties to enter into the Merger Agreement"[62] and a condition precedent to the closing of the Reorganization.[63] The Demutualization was a distinct event that was unaffected by the Strategic Investor Transactions; the Founders' Guarantee only became effective upon the closing of the Reorganization.[64] If the Demutualization met the core-facts test, then so too does the Founders' Guarantee.

### 2. Different Property Interests

One specific application of the core-facts test is that "when a released claim is based on a property interest that is different than the interest that underlies the

---

[61] *Id.* at 1147–48.

[62] Founders' Guarantee at Recitals.

[63] Merger Agr. § 7.6(h).

[64] Founders' Guarantee at Preamble.

16

claims asserted in the action, then the release fails for lack of an identical factual predicate."[65]

In a twist on their core-facts argument, Defendants contend that different property interests foreclose applying the Release to the Founders' Guarantee. They rely on *In re AMC Entertainment Holdings, Inc. Stockholder Litigation*, where the court declined to approve a class action settlement that released claims concerning the ownership of equity units that were not part of the class definition (and antagonistic to the class).[66] The court held that class members would need to, at a minimum, plead ownership of the equity units, along with harm to those property rights, to have standing to pursue the released claims. As a result, the court held that those claims did not share an identical factual predicate sufficient to include them within the scope of the release.

This case is distinguishable. The Reorganization Litigation was a derivative suit and not a class action. Tilray, which benefited from the Founders' Guarantee, was a party. In fact, its majority-Aphria Board, along with the SLC and the plaintiffs in the Reorganization Litigation, agreed to a release that covered the Founders' Guarantee. And the court approved it. Tilray's interest in the Founders' Guarantee is not too remote, for the reasons discussed above. Therefore, the relevant property interests are not too attenuated to render the Release overbroad.

---

[65] *AMC*, 299 A.3d at 526.

[66] *Id.* at 528–29.

17

### 3.    Future Events

A release is also overbroad when it is "based on a set of operative facts that will occur in the future."[67]  "The rule in Delaware is that a release cannot apply to future conduct."[68]

Defendants argue that the Release is overbroad to the extent it covers the Demand.  They correctly observe that the facts underlying the Reorganization Litigation occurred in 2019.  They then note that the Demand did not arise until July 12, 2023, at the earliest—nearly four years later, and four months after this court approved the Settlement.[69]  Defendants say that, given the years intervening between

---

[67] *Phila. Stock Exch.*, 945 A.2d at 1146.

[68]   *UniSuper*, 898 A.2d at 348; *Griffith v. Stein ex rel. Goldman Sachs Grp., Inc.*, 283 A.3d 1124, 1134 (Del. 2022) ("[A] release is overly broad if it releases claims based on a set of operative facts that will occur in the future.  If the facts have not yet occurred, then they cannot possibly be the basis for the underlying action." (quoting *Phila. Stock Exch.*, 945 A.2d at 1146)); *see also Pineda v. Steinberg*, 2008 WL 4817088, at *2 n.5 (Del. Super. Oct. 29, 2008) ("A release usually will not be construed to bar a claim which had not accrued at the date of its execution." (quoting *Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc.*, 347 F.3d 44, 58 (3d Cir. 2001)); *Bank Beal, SSB v. Lucks*, 2001 WL 220252, at *5 n.21 (Del. Ch. Feb. 20, 2001) ("Ordinarily, a release covers only matters expressed in the contract that are in existence at the time of the release.  Demands arising after the signing of the release are not as a rule discharged unless 'expressly embraced therein or falling within the fair import of the terms employed.'" (quoting *Fischer v. Fischer*, 1999 WL 1032768, at *4 (Del. Ch. Nov. 4, 1999)))).

[69] On this point, Plaintiffs also note that the suit between Docklight and High Park over the License Agreement was pending at the time of the Settlement.  Pls.' Opening Br, at 14, 32–33.  Defendants counter that, at the time of the Settlement, Marley Green had not sued or made a demand on Tilray.  Defs.' Answering Br. at 50–51.  This fact, however, does not alter the conclusion that the Founders' Guarantee is part of the same factual predicate as the Released Claims because settlements can release existing contractual obligations.

the Reorganization and the Demand, the Release cannot apply to the claim at issue here.

But Defendants focus on the wrong event. Nothing prohibits a release of contractual obligations (*e.g.*, those under the Founders' Guarantee), even where efforts to enforce that agreement (*e.g.*, the Demand) have not yet occurred. A class or derivative settlement can release parties from contractual obligations.[70] To illustrate this point, imagine if, in 2025, a party to the Merger Agreement sought to enforce its terms against a Released Party. No one would describe the Release as overbroad because the claim for breach of the Merger Agreement did not arise until long after the Settlement. Here, Tilray released the Founders from any obligations under the Founders' Guarantee once the Settlement became final in April 2023. Describing this as impermissibly forward-looking would fail to give finality to any settlement.

The cases cited by Defendants are distinguishable because, in each case, the court struck releases that purported to reach agreements or transactions that had not yet occurred. In *UniSuper*, for example, this court rejected a release provision as overbroad because it purported to release claims related to a rights plan that would be adopted five months after settlement.[71] Observing that "no facts relating to the [rights plan] were alleged in the underlying action, much less were they part of the underlying action's operative facts," the court concluded that the release could not

---

[70] *See, e.g.*, *In re Compellent Techs., Inc. S'holder Litig.*, 2011 WL 6382523 (Del. Ch. Dec. 9, 2011) (settlement included rescission of rights plan).

[71] 898 A.2d at 348.

19

permissibly release claims "arising from an event that has not yet happened."[72]  Here, the Founders' Guarantee was executed contemporaneously with the Reorganization and Merger Agreement, not five months after the Settlement.[73]

## III.  CONCLUSION

The language of the Settlement Stipulation unambiguously covers the Demand.  As a matter of law, the scope of the Release can encompass the Demand. For the foregoing reasons, Plaintiffs' motion for judgment on the pleadings and motion to dismiss the Counterclaim are granted.

---

[72] *Id.*

[73] *See also Griffith,* 283 A.3d at 1135 (rejecting a class action settlement that purported to release claims related to a stock incentive plan that would be approved eight months after the settlement); *In re Third Ave. Tr. S'holder & Derivative Litig.*, C.A. No. 12184-VCL, Dkt. 132 at 61:24–62:10 (Del Ch. June 16, 2017) (TRANSCRIPT) (rejecting a settlement that purported to release claims based on a liquidation that would occur after the settlement).